# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

JAMES G. CONNELL, III,

*Plaintiff–Appellant,*

v.

CENTRAL INTELLIGENCE AGENCY,

*Defendant–Appellee.*

On Appeal from the United States District Court
for the District of Columbia

## OPENING BRIEF OF PLAINTIFF–APPELLANT

Brett Max Kaufman
Sara Robinson
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
bkaufman@aclu.org

Arthur B. Spitzer
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street NW, 2nd Floor
Washington, D.C. 20005
T: 202.601.4226
aspitzer@acludc.org

*Counsel for Plaintiff–Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiff–Appellant respectfully submits this certificate as to parties, rulings, and related cases.

### (A) Parties and Amici

James G. Connell, III is the Plaintiff–Appellant in this matter. The Defendant–Appellee is the Central Intelligence Agency. No amici appeared below, and none are anticipated in this appeal.

### (B) Ruling Under Review

The ruling under review is an order of the district court (Cooper, J.), dated March 29, 2023, granting Defendant's motion for summary judgment. Order, *Connell v. CIA*, No. 21-cv-627 (D.D.C. Mar. 29, 2023), ECF No. 29 (Order at JA481). The district court issued an opinion together with the order. Opinion, *Connell v. CIA*, No. 21-cv-627, 2023 WL 2682012 (D.D.C. Mar. 29, 2023), ECF No. 30 (Op. at JA482–96).

### (C) Related Cases

This case has not previously been on appeal before this Court and there are no related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ........................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................ iv

GLOSSARY OF ABBREVIATIONS ........................................................................ ix

JURISDICTIONAL STATEMENT ............................................................................ 1

STATEMENT OF THE ISSUE .................................................................................... 2

STATEMENT OF THE CASE .................................................................................... 3

SUMMARY OF ARGUMENT ................................................................................ 17

STANDARD OF REVIEW ....................................................................................... 20

ARGUMENT ............................................................................................................. 20

    I.   A Glomar response, which short-circuits the FOIA process, requires a compelling justification that accounts for the complete factual record bearing on the existence or nonexistence of responsive records. ............ 20

   II.  The CIA's Glomar response is neither logical nor plausible. ...................... 26

        A.   The district court improperly conflated the potential secrets contained in CIA records responsive to Mr. Connell's request with the alleged secret protected by the CIA's Glomar response. ... 27

        B.   The district court improperly focused on the "official acknowledgment" test instead of also evaluating the logic and plausibility of the CIA's Glomar response in light of all of the relevant evidence before it. ........................................................... 32

        C.   The record establishes that the CIA had at least some measure of operational control over Camp VII between September 2006 and January 2007, and it is neither logical nor plausible to conclude otherwise. ....................................................................................... 35

III. The CIA waived its ability to assert a Glomar response under the
official acknowledgment doctrine........................................................................ 50

CONCLUSION ....................................................................................................................... 57

CERTIFICATE OF COMPLIANCE........................................................................................ 58

CERTIFICATE OF SERVICE ................................................................................................ 59

ADDENDUM.......................................................................................................................A-1

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013)......3, 23, 24, 25, 26, 32, 39, 42, 49, 50, 51, 52, 55

*ACLU v. DOJ*,
  640 F. App'x 9 (D.C. Cir. 2016)........................................................................ 26

*Alfred A. Knopf, Inc. v. Colby*,
  509 F.2d 1362 (4th Cir. 1975)........................................................................... 56

*Ameziane v. Obama*,
  699 F.3d 488 (D.C. Cir. 2012)....................................................................55, 56

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) .......................................................................................... 21

*Elec. Priv. Info. Ctr. v. NSA*,
  678 F.3d 926 (D.C. Cir. 2012)......................................................................24, 33

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990)........................................................................... 23

*Florez v. CIA*,
  829 F.3d 178 (2d Cir. 2016) ....................................... 23, 24, 33, 34, 35, 38

*Frugone v. CIA*,
  169 F.3d 772 (D.C. Cir. 1999)........................................................................... 55

*Gardels v. CIA*,
  689 F.2d 1100 (D.C. Cir. 1982) ........................................................................ 35

*Knight First Amend. Inst. at Colum. Univ. v. CIA*,
  11 F.4th 810 (D.C. Cir. 2021)................................................. 23, 36, 50, 55

*Leopold v. CIA*,
  987 F.3d 163 (D.C. Cir. 2021)......................................................................50, 57

*Authorities upon which we chiefly rely are marked with asterisks.

*Mil. Audit Project v. Casey*,
  656 F.2d 724 (D.C. Cir. 1981) ............................................................. 22, 56

*Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ............................................................................ 21

*Miranda v. Arizona*,
  384 U.S. 436 (1966) ............................................................................ 12

*N.Y. Times Co. v. DOJ*,
  756 F.3d 100 (2d Cir. 2014) ................................................................ 52

*Phillippi v. CIA*,
  546 F.2d 1009 (D.C. Cir. 1976) ........................................................... 22

*Rasul v. Bush*,
  542 U.S. 466 (2004) ............................................................................. 6

*Roth v. DOJ*,
  642 F.3d 1161 (D.C. Cir. 2011) ........................................................... 23

*Schaerr v. DOJ*,
  69 F.4th 924 (D.C. Cir. 2023) ......................................................... 23, 32

*Shapiro v. DOJ*,
  893 F.3d 796 (D.C. Cir. 2018) ............................................................ 20

*United States v. al Nashiri*,
  AE 467CCC (U.S. Mil. Comm'n Aug. 18, 2023) .............. 5, 6, 8, 11, 12, 49

*United States v. Zubaydah*,
  142 S. Ct. 959 (2022) ..................................................................... 55, 56

*Watts v. Indiana*,
  338 U.S. 49 (1949) .............................................................................. 26

*Wilner v. NSA*,
  592 F.3d 60 (2d Cir. 2009) ................................................................. 21

*Wolf v. CIA*,
  473 F.3d 370 (D.C. Cir. 2007) ...................................................... 20, 23, 25

## Statutes

5 U.S.C. § 552 ................................................................................................ 20, 21

50 U.S.C. § 3023 ................................................................................................ 37

## Other Authorities

Abu Zubaydah, *'I Didn't Know Who I Was Any More': How CIA Torture Pushed Me to the Edge of Death*, Guardian, Jan. 29, 2022 ....................................... 5

ACLU Torture Database, Agenda Re: Interagency Decisions Needed Regarding the 14 High Value Detainees (Nov. 21, 2006) (released on Oct. 31, 2014) ................................................................................................ 41

Carol Rosenberg, *At Guantánamo's Court Like No Other, Progress is Frustrated by State Secrets*, N.Y. Times, May 30, 2023 ........................................... 47

Carol Rosenberg, *Former C.I.A.-Run Prison Emerges as a New Front in Guantánamo's Legal Saga*, N.Y. Times, Apr. 21, 2022 .............................. 8, 9, 47

Carol Rosenberg, *Guantánamo Prison: A Primer*, Miami Herald, Oct. 26, 2016 ................................................................................................ 7

Carol Rosenberg, *Lawyers Press Case that 9/11 Confessions Given to F.B.I. Are Tainted*, N.Y. Times, July 29, 2019 ........................................ 12, 13

Carol Rosenberg, *Military Closes Failing Facility at Guantánamo Bay to Consolidate Prisoners*, N.Y. Times, Apr. 4, 2021 ............................................ 7

Carol Rosenberg, *U.S. Waited Months to Book C.I.A. Prisoners at Guantánamo Bay*, N.Y. Times, Dec. 15, 2021 ............................................ 6, 9

Charlie Savage, *Pentagon Denies Money for Guantánamo Overhaul*, N.Y. Times, Sept. 24, 2013 ................................................................................................ 7

*Control*, Merriam-Webster Dictionary (11th ed. 2023), https://www.merriam-webster.com/dictionary/control .................................. 29

Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005 ................................................................................................ 6

David Stout, *C.I.A. Detainees Sent to Guantánamo*,
N.Y. Times, Sept. 6, 2006 ....................................................................... 6

Diana Priest & Scott Higham, *At Guantánamo, a Prison Within a Prison*,
Wash. Post, Dec. 17, 2004 ..................................................................... 5

Gov't Mot. to Reconsider, *9/11 Case*, AE 692
(U.S. Mil. Comm'n Jan. 13, 2020)....................................................... 48

Gov't Opp., *United States v. Mohammad et al.*, AE 711A
(U.S. Mil. Comm'n Feb. 4, 2020)......................................................... 43

Gov't Opp., *United States v. Mohammad et al.*, AE 779A
(U.S. Mil. Comm'n Apr. 1, 2020)......................................................... 43

Off. of the Inspector Gen., CIA, Counterterrorism Detention and
Interrogation Activities (2004)............................................................. 4

Off. of the Inspector Gen., DOJ, A Review of the FBI's Involvement in and
Observations of Detainee Interrogations in Guantánamo Bay,
Afghanistan, and Iraq (2009).............................................................. 4

Posture Statement of Gen. Jon Kelly Before the S. Armed Servs. Comm.,
113th Cong. (2014) ............................................................................... 6

Press Conf. by the President, Off. of the Press Sec'y (Aug. 1, 2014) ....................... 5

Press Release, President Discusses Creation of Military Commissions to
Try Suspected Terrorists, The White House (Sept. 6, 2006) ................................ 6

Press Release, U.S. Southern Command, U.S. Southern Command Announces
the Transfer of Detainees from Camp VII to Camp V (Apr. 4, 2021).................... 8

S. Select Comm. on Intel., 112th Cong.,
Committee Study of the CIA's Detention and Interrogation Program:
Executive Summary (2014) .......................... 4, 5, 6, 8, 9, 14, 35, 38, 39, 42, 48, 49

S. Comm. on Armed Servs., 110th Cong., Inquiry into the Treatment of
Detainees in U.S. Custody (2008) ...................................................... 4

Tara McKelvey, *A Visit to Guantánamo's Secretive Camp 7*,
BBC News, Aug. 20, 2013................................................................. 13

Testimony of FBI Special Agent Abigail Perkins,
*United States v. Mohammad et al.* (U.S. Mil. Comm'n Sept. 20, 2019) .............. 11

U.S. Gov't Accountability Off., GAO-13-31, Guantánamo Bay Detainees:
Facilities and Factors for Consideration If Detainees Were Brought To
the United States (2012) ...................................................................................... 7

# GLOSSARY OF ABBREVIATIONS

**ACLU**      American Civil Liberties Union

**CIA**      Central Intelligence Agency

**DISO**      Defense Information Security Officer

**DOD**      Department of Defense

**DOJ**      Department of Justice

**FBI**      Federal Bureau of Investigation

**FOIA**      Freedom of Information Act

**GAO**      Government Accountability Office

**ODNI**      Office of the Director of National Intelligence

**SSCI**      Senate Select Committee on Intelligence

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1331. The district court granted summary judgment in favor of Defendant Central Intelligence Agency ("CIA") on March 29, 2023. Order, *Connell v. CIA*, No. 21-cv-627 (D.D.C. Mar. 29, 2023), ECF No. 29 (JA481). Plaintiff timely filed a notice of appeal on May 25, 2023. Notice of Appeal, *Connell v. CIA*, No. 21-cv-627 (D.D.C. May 25, 2023), ECF No. 32 (JA497). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUE**

Whether the district court erred in upholding Defendant's "Glomar response" to Plaintiff's FOIA request for records regarding the CIA's operational control of Camp VII at Naval Station Guantánamo Bay, where formally declassified documents defeat the logic and plausibility of that response and where the CIA has waived its ability to issue a Glomar response through official acknowledgment.

<u>Introduction</u>

This case asks just how far the government can stretch logic, plausibility, and common sense in the service of enforcing its own version of official secrecy. As it did in a similar reality-bending case, the Court should refuse to "give [its] imprimatur to a fiction of deniability that no reasonable person would regard as plausible." *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013) (Garland, C.J.).

Plaintiff–Appellant James G. Connell, III, an attorney representing defendant Ammar al Baluchi in the 9/11 case before the military commission at Guantánamo Bay, filed a FOIA request with the CIA seeking information about the agency's "operational control" over Camp VII, a detention site at Guantánamo for so-called "high-value detainees," including his client. While the agency did produce three responsive records, it also issued a "Glomar response" as to the rest, refusing to confirm or deny whether any other responsive records exist. That response is neither logical or plausible, and this

---

Plaintiff–Appellant, James G. Connell, III, though contracted by the Department of Defense, acts only in his individual capacity, and does not represent the position of that agency or the United States. Mr. Connell does not confirm or deny any classified information in this brief, and any citation to publicly reported information should not be read to confirm or deny such information.

Court should reject it. There are reams of relevant record evidence in this case that undermine the CIA's response by establishing that the CIA had at least some measure of operational control over Camp VII—and further, the CIA has, through some of that same evidence, waived through official acknowledgment its right to invoke Glomar here.

Factual Background

Six days after the September 11, 2001 attacks, President George W. Bush authorized the CIA "to capture and detain persons" at detention sites outside the United States.[2] So began the CIA's "rendition, detention, and interrogation program," wherein dozens of Muslim men and boys were abducted, tortured, held incommunicado, and denied legal process. The program is both well documented and universally acknowledged by the government.[3] The torture

---

[2] Off. of the Inspector Gen., CIA, Counterterrorism Detention and Interrogation Activities (2004), https://www.cia.gov/readingroom/docs/0005856717.pdf (quoting Mem. of Notification for Members of the Nat'l Sec. Council (Sept. 17, 2001)).

[3] *See generally, e.g.*, S. Comm. on Armed Servs., 110th Cong., Inquiry into the Treatment of Detainees in U.S. Custody (2008), https://www.armed-services.senate.gov/imo/media/doc/Detainee-Report-Final_April-22-2009.pdf; Off. of the Inspector Gen., DOJ, A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantánamo Bay, Afghanistan, and Iraq (2009), https://www.oversight.gov/sites/default/files/oig-reports/s0910.pdf; S. Select Comm. on Intel., 112th Cong., Committee Study of the CIA's Detention and Interrogation Program: Executive Summary (2014), *available at* https://www.intelligence.senate.gov/sites/default/files/documents/CRPT-113srpt288.pdf ("SSCI Report") (excerpted at JA79–82,

included waterboarding, deprivation of sleep and solid food, confinement in small dark boxes, forced stress positions, and sexual violence, among other abuses.[4]

To facilitate the program, the CIA searched for detention sites, concluding that a U.S. military base outside of the United States was the "best option."[5] By September 2003, the CIA was holding several detainees at CIA facilities "on the grounds of, but separate from" U.S. military detention facilities at Guantánamo Bay, Cuba.[6] The guards at those facilities were "dressed as soldiers," and the New York Times reported that they were from

---

JA110–15, JA159); Press Conf. by the President, Off. of the Press Sec'y (Aug. 1, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/08/01/press-conference-president; *see also* ACLU Torture Database, https://www.thetorturedatabase.org (compiling government documents obtained through FOIA requests and litigation).

[4] *See United States v. al Nashiri*, AE 467CCC (U.S. Mil. Comm'n Aug. 18, 2023) ("Nashiri Op.") (JA501–02, JA513) (listing the torture techniques used by interrogators in an unclassified decision); *see generally* SSCI Report; *see also* Abu Zubaydah, *'I Didn't Know Who I Was Any More': How CIA Torture Pushed Me to the Edge of Death*, Guardian, Jan. 29, 2022, https://www.theguardian.com/us-news/2022/jan/29/abu-zubaydah-cia-torture-waterboarding-guantanamo.

[5] SSCI Report at JA79–80 (quoting a memorandum for the Director of Central Intelligence entitled "Approval to Establish a Detention Facility for Terrorists").

[6] *Id.* at JA112; *see also* Diana Priest & Scott Higham, *At Guantánamo, a Prison Within a Prison*, Wash. Post, Dec. 17, 2004, https://www.washingtonpost.com/wp-dyn/articles/A5918-2004Dec16.html.

the CIA.[7] Less than a year later, the CIA transferred those detainees to other

CIA facilities abroad to avoid any ramifications from a then-pending Supreme

Court decision on detainee habeas corpus rights.[8] Together with the site at

Guantánamo, those facilities comprised the network of secret U.S. prisons and

torture sites around the world known as the "black sites."[9]

In early September 2006, the CIA transferred fourteen individuals—the

so-called high-value detainees—to "the high-value detention center"[10] at

Guantánamo, also known as Camp VII.[11] At Camp VII, the detainees were kept

---

[7] Carol Rosenberg, *U.S. Waited Months to Book C.I.A. Prisoners at Guantánamo Bay*, N.Y. Times, Dec. 15, 2021, https://www.nytimes.com/2021/12/15/us/politics/guantanamo-bay-cia-prisoners.html.

[8] SSCI Report at JA112–13 (discussing *Rasul v. Bush*, 542 U.S. 466 (2004), which had not yet been decided); Nashiri Op. at JA513.

[9] Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, https://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.html.

[10] Expanded Background Mem. at JA319; Press Release, President Discusses Creation of Military Commissions to Try Suspected Terrorists, The White House (Sept. 6, 2006), https://georgewbush-whitehouse.archives.gov/news/releases/2006/09/20060906-3.html; David Stout, *C.I.A. Detainees Sent to Guantánamo*, N.Y. Times, Sept. 6, 2006, https://www.nytimes.com/2006/09/06/washington/06cnd-bush.html.

[11] Mil. Comm'n Tr. at JA367. Camp VII, which was meant to be a temporary facility, was built on a streambed. The poor site selection led to considerable infrastructure-related problems, including a buckling foundation and sewage leaks. *See* Posture Statement of Gen. Jon Kelly Before the S. Armed Servs. Comm., 113th Cong. 15 (2014), https://www.armed-services.senate.gov/imo/media/doc/Kelly_03-13-14.pdf; Charlie Savage, *Pentagon Denies Money for Guantánamo Overhaul*, N.Y. Times, Sept. 24, 2013,

"mostly isolated,"[12] in "climate-controlled segregated housing units that limit[ed] their ability to communicate with each other."[13] Food was passed to detainees through a "lockable slot," which was otherwise kept closed.[14] Detainees had strictly limited recreation time,[15] which took place in what detainees described as a "cage" enclosed within a metal barrier and fabric.[16] A defense lawyer who visited the facility after it was closed[17] described it as

---

https://www.nytimes.com/2013/09/25/us/politics/pentagon-denies-money-for-guantanamo-overhaul.html.

[12] Carol Rosenberg, *Military Closes Failing Facility at Guantánamo Bay to Consolidate Prisoners*, N.Y. Times, Apr. 4, 2021 (updated Sept. 23, 2021), https://www.nytimes.com/2021/04/04/us/politics/guantanamo-bay-prisoners.html ("Rosenberg 4/4/21").

[13] U.S. Gov't Accountability Off., GAO-13-31, Guantánamo Bay Detainees: Facilities and Factors for Consideration If Detainees Were Brought To the United States 21 (2012), https://www.gao.gov/assets/gao-13-31.pdf ("GAO Report").

[14] Mil. Comm'n Tr. at JA393.

[15] GAO Report at 21.

[16] Carol Rosenberg, *Guantánamo Prison: A Primer*, Miami Herald, Oct. 26, 2016 (updated June 9, 2018), https://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article1939250.html. While in the "cage," each detainee was allowed to speak with one other prisoner through a tarp; the conversations were recorded for intelligence purposes. Rosenberg 4/4/21.

[17] All detainees in Camp VII were moved to Camp V on April 4, 2021. *See* Press Release, U.S. Southern Command, U.S. Southern Command Announces the Transfer of Detainees from Camp VII to Camp V (Apr. 4, 2021), https://www.southcom.mil/News/PressReleases/Article/2560548/us-

"akin to being entombed,"[18] while another attorney remarked that she would rather stay in a maximum security prison than in Camp VII.[19]

According to the Senate Select Committee on Intelligence's Torture Report (the "SSCI Report"), after their arrival to Camp VII, the fourteen high-value detainees "remained under the operational control of the CIA."[20] On September 1, 2006, the CIA Director signed a Memorandum of Agreement with the Department of Defense ("DOD") concerning "the detention by DOD of certain terrorists at a facility at Guantánamo Bay Naval Station" and "set[ing] out the duties and responsibilities of DOD and CIA."[21] The New York Times reported that, as in the previous high-value detention camp at Guantánamo, the Camp VII detainees were guarded by CIA contractors wearing military

---

southern-command-announces-the-transfer-of-detainees-from-camp-vii-to-camp-v.

[18] Carol Rosenberg, *Former C.I.A.-Run Prison Emerges as a New Front in Guantánamo's Legal Saga*, N.Y. Times, Apr. 21, 2022, https://www.nytimes.com/2022/04/21/us/politics/cia-prison-gitmo.html ("Rosenberg 4/21/22").

[19] *Id.*

[20] SSCI Report at JA114 (citing a "CIA Background Memo for CIA Director visit to Guantánamo," dated December 2006, "entitled Guantánamo Bay High-Value Detainee Detention Facility"); *see also* Nashiri Op. at JA518.

[21] DOD–CIA MOA at JA307 (emphasis omitted).

uniforms.[22] The CIA also sent "site daily reports" and cables about the

detainees.[23] And on December 21, 2006, the Director of the CIA, Michael

Hayden, visited Guantánamo.[24] The background memorandum prepared for

his trip included information about Camp VII, which it referred to as the

"Guantánamo Bay High-Value Detainee Detention Facility," as well as over a

dozen pages of information about the detainees held there.[25]

Although the first Camp VII commander was a military and not a CIA

official,[26] there is evidence that the CIA played a role in decision-making at the

facility.[27] The Camp VII commander first received information about his

---

[22] Carol Rosenberg, *U.S. Waited Months to Book C.I.A. Prisoners at Guantánamo Bay*, N.Y. Times, Dec. 15, 2021, https://www.nytimes.com/2021/12/15/us/politics/guantanamo-bay-cia-prisoners.html; Rosenberg 4/21/22; *see also* Mil. Comm'n Tr. at JA378–89, JA413–14.

[23] SSCI Report at JA111 & nn.427–28; Pradhan Decl. at JA151 ¶¶ 6–8; Mil. Comm'n Tr. at JA209, JA216–17, JA182–84.

[24] Expanded Background Mem. at JA318–43.

[25] *Id.* at JA319, JA323–36; *see also* SSCI Report at JA114 (citing the background memorandum).

[26] Mil. Comm'n Tr. at JA365.

[27] The first Camp VII commander also confirmed that in addition to DOD personnel, "a representative from another Government agency" participated in the two daily meetings about Camp VII. *Id.* at JA401. And he verified that Camp VII was his duty station as well as the "duty station of some other government agencies." *Id.* at JA408.

mission in "an interagency meeting."[28] And when operational issues required

elevation beyond the Camp VII commander and his supervisor, they were

brought to the interagency Special Detainee Follow Up Group.[29] The Special

Detainee Follow Up Group would sometimes issue directives by e-mail and

video teleconference to the Camp VII commander.[30] For example, at one point,

the commander wanted to facilitate communal prayer for the detainees on

Fridays, when many Muslims congregate to pray, as was done in other camps

at the base.[31] But governing policy from the interagency process prevented

him from doing so.[32]

The CIA also played a key role in other interagency processes

concerning operational issues related to the detainees. For example, on

November 29, 2006, the CIA participated in a meeting to discuss security

issues related to the fourteen high-value detainees, including detainee access,

---

[28] *Id.* at JA388–89.

[29] *Id.* at JA399–400, JA470, JA473–74. The Special Detainee Follow Up Group was supervised by the Special Leadership Oversight Committee, made up of more senior government officials. *See id.* at JA400, JA473–74.

[30] *Id.* at JA403–04.

[31] *See id.* at JA406.

[32] *Id.* at JA406–07, JA473–74.

security clearances, and media policy.[33] At the meeting, the CIA and other

participants also discussed "procur[ing] admissions to use at trial,"[34] which

aligned with the CIA's "end game," to "assist DOD in any way possible in the

Military Commissions process, while at the same time protecting CIA

equities."[35] More specifically, the CIA agreed that "a law enforcement team

should be allowed to conduct a 'historical narrative' interview" of each of the

Camp VII detainees.[36]

The Camp VII detainees were ultimately questioned by representatives

from "various agencies" in January and February 2007.[37] In advance of the

questioning, the CIA participated in the High-Value Detainee Prosecution Task

Force, a joint effort of the CIA, FBI, DOD, NSA, and Office of the Chief

Prosecutor at the military commissions.[38] FBI agents on the Taskforce spent

---

[33] Interagency Meeting Agenda at JA354–55; Interagency Meeting Mem. at JA358–59.

[34] Interagency Meeting Agenda at JA355; *see also* Mil. Comm'n Tr. at JA454 (discussing testimony of FBI Special Agent Abigail Perkins at 26647–48, *United States v. Mohammad et al.* (U.S. Mil. Comm'n Sept. 20, 2019), https://www.mc.mil/Portals/0/pdfs/KSM2/ KSM%20II%20(TRANS20Sept2019-MERGED).pdf).

[35] Background Mem. at JA305; Expanded Background Mem. at JA320.

[36] Interagency Meeting Agenda at JA360.

[37] Nashiri Op. at JA516; *see also* Mil. Comm'n Tr. at JA380.

[38] Mil. Comm'n Tr. at JA455–56.

months reviewing hardcopy and digital CIA material on an offsite closed computer system.[39]

Additionally, the CIA decided with the Department of Justice ("DOJ") that at the start of the interviews, each detainee would be given a "limited rights advisement" instead of the usual *Miranda* warnings.[40] The CIA gave input on the content of the advisements, which included that the interviewers themselves did not work for "any organization that previously held the Accused" but did not include the right to counsel.[41] Further, interviewers, regardless of agency affiliation, were instructed to write up their notes on a CIA laptop as a "letterhead memorandum;" the standard FBI 302 form was not

---

[39] *Id.* at JA453–54, JA456, JA458–59; *see id.* at JA516–17; Nashiri Op. at JA516–17; *see also* Carol Rosenberg, *Lawyers Press Case that 9/11 Confessions Given to F.B.I. Are Tainted*, N.Y. Times, July 29, 2019, https://www.nytimes.com/2019/07/29/us/politics/september-11-confessions-guantanamo.html.

[40] Nashiri Op. at JA532–33 & nn.60–61 (discussing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

[41] Nashiri Op. at JA517–18, JA532–34.

used.[42] They were also told to put any claims of CIA torture or other mistreatment on a separate memorandum.[43]

The full measure of the CIA's operational control over Camp VII has been a long-running focus of discovery in the military commission at Guantánamo trying five defendants for perpetrating the September 11 attacks, as well as other military commission proceedings.[44] Mr. Connell and his military commissions defense team colleagues have sought discovery in that case on the topic for more than a decade.[45] He was the first attorney to visit a client at Camp VII, following an order of a military commission.[46] Mr. Connell and others have also observed and taken testimony from firsthand participants in

---

[42] Mil. Comm'n Tr. at JA196; Carol Rosenberg, *Lawyers Press Case that 9/11 Confessions Given to F.B.I. Are Tainted*, N.Y. Times, July 29, 2019, https://www.nytimes.com/2019/07/29/us/politics/september-11-confessions-guantanamo.html.

[43] Carol Rosenberg, *Lawyers Press Case that 9/11 Confessions Given to F.B.I. Are Tainted*, N.Y. Times, July 29, 2019, https://www.nytimes.com/2019/07/29/us/politics/september-11-confessions-guantanamo.html.

[44] For example, the military commission granted a motion to compel CIA records related to Camp VII. *See* Jan. 2022 Discovery Order at JA228; *see also* Mot. to Compel at JA161; Mil. Comm'n Tr. at JA179–229.

[45] *See, e.g.*, Mil. Comm'n Tr. at JA438; Mar. 2022 Discovery Order at JA476.

[46] Tara McKelvey, *A Visit to Guantánamo's Secretive Camp 7*, BBC News, Aug. 20, 2013, https://www.bbc.com/news/world-us-canada-23771851.

the goings-on at Camp VII.[47] Although many details remain outside the public domain, these and other defense teams' efforts have unearthed a considerable amount of information about the extent of the CIA's operational control over Camp VII.

## Procedural History

To learn more about the CIA's operational control over Camp VII, on May 23, 2017, Mr. Connell filed a FOIA request with the CIA.[48] Citing to the relevant portion of the SSCI Report, he requested "any and all information that relates to such 'operational control' of the CIA over Guantánamo Bay detainees."[49]

Five months later, the CIA acknowledged receipt of the request,[50] and another three-and-a-half months after that, it asked Mr. Connell for clarification regarding the scope of the request.[51] In response, Mr. Connell specified that he was interested in records that shed light on the meaning and extent of the CIA's "operational control" over Camp VII during the time period

---

[47] *See, e.g.*, Mil. Comm'n Tr. at JA362 (testimony from the first Camp VII commander); *id.* at JA453–54, JA456, JA458, JA459 (referencing testimony from FBI agents who questioned detainees held at Camp VII); *id.* at JA196 (same).

[48] FOIA Req. at JA58.

[49] *Id.* (quoting SSCI Report at JA114).

[50] CIA Confirmation at JA61.

[51] CIA Clarification Req. at JA62.

from September 1, 2006, to January 31, 2007.[52] To illustrate the meaning of his request, he listed seven categories of records that he would consider to be responsive, "by way of example and not limitation."[53] His examples included records that indicated whether the CIA's operational control extended to other facilities, how much decision-making authority the CIA had over Camp VII, and when the CIA's operational control over Camp VII expired, among others.[54] On May 4, 2018, the CIA acknowledged receipt of Mr. Connell's letter.[55]

Nearly two and a half years later, on September 29, 2020, the CIA produced to Mr. Connell one document with redactions but, as to anything else, issued a "Glomar response" stating that "the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request."[56] Mr. Connell filed a timely administrative appeal, but heard nothing further from the agency until he filed this lawsuit.[57]

---

[52] Connell Clarification at JA63.

[53] *Id.*

[54] *Id.*

[55] CIA Receipt at JA66.

[56] FOIA Resp. at JA68. The document that was produced is found at JA303–05 (Background Mem.).

[57] Admin. Appeal at JA70.

On March 8, 2021, representing himself, Mr. Connell filed his complaint.[58] Subsequent to filing its answer, on July 15, 2021, the CIA provided a final response to Plaintiff's FOIA request.[59] In doing so, the agency effectively withdrew its initial Glomar response, because after conducting a search of only unclassified or previously released records, it produced two additional documents with redactions,[60] and acknowledged but withheld a third document in its entirety.[61] The agency also issued a new Glomar response as to any remaining documents.[62]

The CIA moved for summary judgment,[63] which the district court granted.[64] The district court upheld the CIA's Glomar response, finding it "logical" and "plausible." Op. at JA487–489, JA495. It further held that the CIA had not waived its ability to assert a Glomar response through official acknowledgment after determining that Mr. Connell's proffered

---

[58] Compl. at JA5–30.

[59] Final FOIA Resp. at JA73.

[60] The two documents that were produced are found at JA307–14 (DOD–CIA MOA) and at JA316–43 (Expanded Background Mem.).

[61] Blaine Decl. at JA41 ¶ 21.

[62] Final FOIA Resp. at JA73.

[63] Def.'s Mot. for Summ. J., *Connell v. CIA*, No. 21-cv-627 (D.D.C. Mar. 29, 2023), ECF No. 13.

[64] Order at JA481; Op. at JA482.

acknowledgements either did not go to CIA operational control or could not be attributed to the CIA itself. *Id.* at JA490–495. Last, the district court held that even if the CIA had officially acknowledged its operational control over Camp VII, Mr. Connell would only be entitled to the disclosure of the existence of the specific documents he offered as official acknowledgments, and all of those documents had either been released to him or were otherwise publicly available. *Id.* at JA495.

Plaintiff timely appealed.[65] While Plaintiff initially brought claims regarding CIA redactions and the withholding of a document in its entirety, the only issue on appeal is the CIA's Glomar response.

## SUMMARY OF ARGUMENT

Through FOIA, Congress compels agencies to search for records responsive to requests for government information. In rare situations, an agency may lawfully assert a "Glomar response" to refuse to engage in any search at all. While decades ago, Glomar responses were unusual, they have now become commonplace, especially in response to requests to the CIA. When using Glomar, an agency is not protecting any secrets in potentially responsive documents. Instead, it is protecting a unique, somewhat meta-

---

[65] NOA at JA497.

secret: whether responsive records do, or do not, exist at all. The Glomar response is powerful. By refusing to confirm or deny the very existence or nonexistence of responsive records, an agency cuts the FOIA process off before it even begins. For that reason, courts scrutinize Glomar responses closely.

Agencies have a basic and mandatory obligation to explain why a Glomar response is logical or plausible. In assessing a Glomar response against that standard, courts must consider the entire record. If an agency's Glomar response cannot meet that bar, because the record indicates that it is not logical or plausible that the agency has no responsive records, the Glomar response fails. Separately, under the official acknowledgment doctrine, prior official statements can waive an agency's ability to assert a Glomar response to a particular request.

In this case, the district court collapsed all of its analysis into official acknowledgment, without assessing the entire record and evaluating the logic and plausibility of the agency's Glomar response. Because the court concluded that various documents and other information did not waive the CIA's right to issue a Glomar response by official acknowledgment, the court ignored that evidence entirely. But even if that evidence fell short of official acknowledgment—and at least some of it does not—the court was required to

consider it when determining whether the CIA's Glomar response was logical or plausible.

All considered, the record evidence defeats the CIA's Glomar response because it leaves no doubt that the CIA maintained some measure of operational control over detainees at Camp VII during the relevant time period. Mr. Connell broadly requested CIA records regarding the agency's "operational control" over Camp VII, a detention site at Guantánamo Bay for so-called "high value" detainees. Mr. Connell's request borrowed the phrase "operational control" from the SSCI Report, which used the term while citing to a CIA document that the CIA acknowledged and produced as responsive to Mr. Connell's request. The SSCI Report, which was released with the President's blessing after an executive branch declassification review following direct input and responses from the CIA, conclusively undermines the agency's Glomar response. Other declassified documents in the record, too, address the measure of the CIA's power and authority over Camp VII. And documents and transcripts from the Guantánamo military commissions proceedings further undermine any CIA claim to secrecy over whether records responsive to Mr. Connell's request, in fact, exist.

Separately, through some of these same documents, the CIA has waived its ability to issue a Glomar response in this case through official acknowledgment, and the district court was wrong to conclude otherwise.

This Court should reject the CIA's Glomar response, reverse the district court's judgment, and remand the case with instructions to order the agency to search for all responsive records, to release responsive records, and to justify any withholdings of other responsive information or records.

## STANDARD OF REVIEW

This Court reviews summary judgment orders *de novo*. *Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018). Under FOIA, "'the burden is on the agency to sustain its action,' 5 U.S.C. § 552(a)(4)(B), and the Court reviews *de novo* the agency's use of a FOIA exemption to withhold documents." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

## ARGUMENT

I. **A Glomar response, which short-circuits the FOIA process, requires a compelling justification that accounts for the complete factual record bearing on the existence or nonexistence of responsive records.**

FOIA's basic presumption is that the government must disclose any of its records that are responsive to a request. 5 U.S.C. § 552(a)(3)(A). Of course, the rule is not categorical: since Congress recognized that the disclosure of certain

records might be contrary to legitimate public or private interests, FOIA allows for nine narrow, exclusive exemptions. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). These "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

Consistent with that objective, when an agency refuses to disclose records responsive to a FOIA request, the agency bears the burden of justifying its refusal—that is, the agency must prove that the withheld records fall within one of the FOIA's exemptions. 5 U.S.C. § 552(a)(4)(B). This burden is high. FOIA exemptions are to be "narrowly construed," *Milner*, 562 U.S. at 565 (citation omitted), and "all doubts as to the applicability of [an] exemption must be resolved in favor of disclosure," *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009).

Sometimes, an agency may seek to avoid the ordinary FOIA process entirely by refusing to confirm or deny the very existence or nonexistence of records responsive to a request. This refusal is known as a "Glomar response," thanks to the CIA's first, now-famous attempt to make such a claim. Almost half a century ago, the CIA sought to keep secret, through the use of a cover story, its attempt to salvage a sunken Soviet submarine using a large vessel, built by the filmmaker Howard Hughes, called the Hughes Glomar Explorer.

*See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). The press got wind of the attempt, and "Director William Colby and other CIA officials then scrambled to suppress the story." *Mil. Audit Project v. Casey*, 656 F.2d 724, 754 (D.C. Cir. 1981). Ultimately, the agency stonewalled FOIA requests for records about the vessel's real objective by maintaining that any response would harm national security by revealing a classified secret. *See id.* at 730–31.

For several decades, the government rarely used the Glomar response, but it has made Glomar fairly commonplace today.[66] In a Westlaw search, the term "Glomar" shows up in 329 total cases in the District Court for the District of Columbia and in this Court, with 207 of them coming in the last ten years. The CIA's use of the term, in particular, has become something of a perverse point of pride. When the agency joined Twitter, its first post read "We can neither confirm nor deny that this is our first tweet."[67]

---

[66] The phrase "can neither confirm nor deny the existence or nonexistence" has become so well known that it has been the subject of extensive media attention, and even public art. *See, e.g.*, Radiolab, *Neither Confirm Nor Deny*, WNYC Studios (June 4, 2019), https://radiolab.org/podcast/confirm-nor-deny; David Birkin, Severe Clear part 1: Existence or Nonexistence (2014), https://www.davidbirkin.net/existence-or-nonexistence.

[67] @CIA, Twitter (June 6, 2014, 10:49 a.m.), https://twitter.com/CIA/status/474971393852182528.

"Because Glomar responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information," they are valid only when the act of "confirming or denying the existence of records would itself cause harm under a FOIA exception." *Roth v. DOJ*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (cleaned up). These explanations, no matter how detailed, must be logical or plausible in light of all of the evidence in the record on summary judgment; if they are not, the agency's Glomar response is unlawful. *Schaerr v. DOJ*, 69 F.4th 924, 926 (D.C. Cir. 2023); *ACLU v. CIA*, 710 F.3d at 429 (citing *Wolf*, 473 F.3d at 375); *Florez v. CIA*, 829 F.3d 178, 184–85 (2d Cir. 2016).

A plaintiff can defeat an agency's Glomar response in two main ways. Sometimes, a plaintiff will point to official government statements—"official acknowledgments"—that directly or indirectly reveal that responsive records exist (or do not exist). *See ACLU v. CIA*, 710 F.3d at 426–27; *see also Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). Official acknowledgment is a waiver doctrine. *Knight First Amend. Inst. at Colum. Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021); *see ACLU v. CIA*, 710 F.3d at 426. For example, in *ACLU v. CIA*, this Court concluded that because various statements by the President and his counterterrorism advisor had made the CIA's intelligence interest in drone

strikes "clear," the agency had waived its ability to use a Glomar response because it "beggar[ed] belief that [the agency] d[id] not . . . have documents relating to drones." 710 F.3d at 431.

But waiver by official acknowledgment is distinct from an agency's basic, and mandatory, obligation to explain, with reasonable specificity, why a Glomar response is logical or plausible. Even in the absence of any official acknowledgment, that burden can only be carried where the agency's explanations "are not called into question by contradictory evidence in the record." *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). So while it is true that outside "disclosures cannot *waive* the asserting agency's right to a Glomar response, . . . such disclosures may well shift the factual groundwork upon which" courts evaluate the overall legitimacy of the response. *Florez*, 829 F.3d at 186 (emphasis added).

Critically, the defeat of an agency's Glomar response does not compel it to release any records. At that point, as this Court explained in *ACLU v. CIA*, an agency might do one of several things. It might release documents, and it might release an index of responsive records and FOIA exemptions it believes justify their withholding. 710 F.3d at 432. Or it might issue a "no number, no list" response, acknowledging the existence of records but claiming that all information *about* those records is exempt. *Id.* at 433. Or it might do

24

something in the middle of that "continuum." *Id.*[68] Regardless of what an agency does next, though, the bottom line is that absent a logical or plausible Glomar response, an agency is not "permitted . . . to end the litigation without acknowledging the existence of any responsive documents." *Id.* at 432.

That is true even where it appears likely that an agency will ultimately be able to carry its burden to withhold all records responsive to a FOIA request. In other words, the secrecy of the *contents* of responsive records is a distinct, and subsequent, issue to the secrecy of the *existence or nonexistence* of those records. *See ACLU v. CIA*, 710 F.3d at 433 (discussing *Wolf*, 473 F.3d at 380). Thus, in some cases, the defeat of a Glomar response will not lead to any document disclosures at all. That is precisely what happened in *ACLU v. CIA*: three years after this Court issued its full-throated rejection of the CIA's Glomar response, the Court affirmed, in an unpublished per curiam order, the

---

[68] In this case, by acknowledging the existence of some responsive records and issuing a Glomar response as to any others, the CIA has essentially provided a "partial" Glomar response. That, itself, is somewhat illogical. But even if it is a valid option, it is effectively a form of a "no number no list" response. An agency using a "no number no list" response concedes that it has *at least one* responsive record. Here, the CIA concedes it has *at least three* responsive records. Critically, because "no number no list" responses are somewhat "radical[]," with the potential to make a mockery of FOIA altogether, this Court has held they can "only be justified in unusual circumstances, and only by a particularly persuasive affidavit." *ACLU v. CIA*, 710 F.3d at 433.

district court's grant of summary judgment allowing the agency to withhold all of its responsive records. *See ACLU v. DOJ*, 640 F. App'x 9 (D.C. Cir. 2016).

But the deflated coda to *ACLU v. CIA* did not wipe away the Court's unsparing Glomar ruling, or the important difference between requiring an agency to show that all the contents of requested documents are classified or otherwise exempt, and not requiring an agency to make such a showing. In that opinion, the Court chastised the CIA's attempt to coax "the courts" into "stretch[ing] [the Glomar] doctrine too far" and into "giv[ing] their imprimatur to a fiction of deniability that no reasonable person would regard as plausible." 710 F.3d at 341. And it made clear that "courts should not be ignorant as judges of what they know as men and women." *Id.* (quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949) (Frankfurter, J.)) (cleaned up). To do otherwise would be to endorse an official version of secrecy that undermines the credibility of the courts as neutral arbiters of facts and truth, and flips FOIA on its head.

## II.    The CIA's Glomar response is neither logical nor plausible.

The district court erred when it failed to consider the full scope of record evidence in evaluating whether the CIA's Glomar response was logical or plausible. The court misdirected its analysis at CIA secrets that might be revealed through the disclosure of responsive records, rather than the narrower question presented at the Glomar stage. And although the district

court did consider (and got wrong) whether the CIA waived its ability to assert a Glomar response through official acknowledgments, it failed to conduct a baseline evaluation, in light of all record evidence, of whether the CIA's Glomar response is logical or plausible. On a proper consideration of the record, it is not.

A.    The district court improperly conflated the potential secrets contained in CIA records responsive to Mr. Connell's request with the alleged secret protected by the CIA's Glomar response.

Mr. Connell's request was broad. It requested "any and all information that relates to [the] 'operational control' of the CIA over Guantánamo Bay detainees" at Camp VII referenced in the SSCI Report. FOIA Req. at JA58. And when the CIA finally responded to the request, it sought "clarification" regarding the "quite broad" request's "scope," including "more details about the aspects of operational control that interest[ed] [him]," as well as "a specific period of time" to confine the search. CIA Clarification Req. at JA62; *see* Op. at JA484. As requested, Mr. Connell wrote back, explaining that he was seeking "to determine what 'operational control' means" and that he was requesting records relating to the CIA's operational control over Camp VII between September 1, 2006, and January 31, 2007. Connell Clarification at JA63. He

also gave, "[b]y way of example and not limitation," a "list of possible topics" related to "operational control." *Id.*[69]

Misapprehending the distinction between the potential secrets in the CIA's responsive records and the secret protected by the agency's Glomar response led to the district court's biggest mistake. It is true, as the district court wrote, that "the topic" of the request included "not only *the fact* of the CIA's purported 'operational control' over Guantánamo detainees from September 2006 to January 2007, but also . . . *details* about the CIA's purported operational control, including" Mr. Connell's seven exemplary categories of information. Op. at JA490 (cleaned up and emphases added). And it is also true that records containing such details would be responsive to the request. But the *topic* of a FOIA request, and the *details* that responsive records might contain, are not the same as the *secret* that agency is purporting to protect via a Glomar response.

In this case, the secret the CIA is ostensibly protecting through its Glomar response is simply whether it does or does not have *any* records

---

[69] When the CIA finally issued its Glomar response, it "[t]reat[ed] Connell's clarifications as an amended request." Op. at JA484. Semantics aside, his clarifications expressly did not alter the subject matter of his request.

relating to the agency's operational control over Camp VII during the relevant time period.[70]

That is straightforward enough, but there is a problem: the SSCI Report's reference to "operational control," which formed the basis of Mr. Connell's request, did not define the term. Indeed, the natural breadth of the phrase compelled the agency to seek clarification about what kinds of records Mr. Connell was really after. Vague as it might be, the ordinary reading of "operational control" is not, as the district court appeared to assume,[71] a binary proposition, nor an exclusive one. "Control" itself means "power or authority to guide or manage." *Control*, Merriam-Webster Dictionary (11th ed. 2023), https://www.merriam-webster.com/dictionary/control. That definition does not at all imply an on/off switch. Nor does it suggest equivalence to "custody." So records about the agency's "operational control" over Camp VII might reasonably and logically reflect a wide variety of

---

[70] Recall that the agency initially responded to Mr. Connell's request by producing one record and issuing a Glomar response as to the rest. FOIA Resp. at JA68. It then issued a final response to the request, acknowledging another three records (which were originally covered by its first Glomar response), and issuing a new Glomar response as to any more. Final Resp. at JA73.

[71] *See* Op. at JA489 n.2 (explaining the court's conclusion that "declassified documents" provided by Mr. Connell "do not *definitively* disclose the CIA's 'operational control' over Camp 7" (emphasis added)); *see also id.* at JA492–94.

information related to the agency's connection to, relationship with, and authority (or partial authority) over, the site.

And that is precisely how the CIA understood Mr. Connell's clarified request. The CIA's declarant explained that the agency issued a Glomar response to keep secret a potential "classified *connection* between the Agency and the subject of Plaintiff's Amended FOIA Request." Blaine Decl. at JA43 ¶ 26 (emphasis added). And when the CIA searched its files for unclassified records, with Mr. Connell's example topics in mind, it searched for "records that might reflect an unclassified or otherwise openly acknowledged *relationship* between the CIA" and operational control over Camp VII. *Id.* at JA40–41 ¶¶ 20 (emphasis added). It even came up with search terms beyond simply "operational control" that it might find in responsive materials. *See id.* at JA41 ¶ 21. And when the agency found, and produced, unclassified records that it determined were responsive to the request, those records did not use the phrase "operational control." *See* Background Mem. at JA303; DOD–CIA MOA at JA307; Expanded Background Mem. at JA316.

The agency, accurately, understood Mr. Connell to be asking for information about its *connection* to, and its *relationship* with, Camp VII.[72] And

---

[72] The CIA appeared to take a different position on reply before the district court. There, the CIA argued that the "link" or "connection" between the CIA

that information would, in turn, shed light on exactly what Mr. Connell hoped to illuminate through his request: a better understanding of the *measure* or *extent* of the agency's power or authority over detainees at Camp VII during the specified time period. At Camp VII, the CIA might have controlled some operations, and not others. Perhaps DOD controlled those. Maybe they controlled some operations jointly, or by consensus with other agencies, as well.

All the CIA's Glomar response does, and can, protect is the agency's purportedly secret possession of records about the measure or extent of the CIA's operational control over Camp VII during the five-month period covered by the request. If the record establishes that it is not logical or plausible that the agency has no such records, the CIA must acknowledge that it does, in fact, have them—even if those records ultimately never see the light of day.

---

and Camp VII was not part of the "alleged CIA operational control over Camp VII" and so was not "at issue in this FOIA case." Def.'s Reply at 10–11, 13, *Connell v. CIA*, No. 21-cv-627 (D.D.C. Mar. 29, 2023), ECF No. 27. That position is hard to square with the agency's declaration.

B. **The district court improperly focused on the "official acknowledgment" test instead of also evaluating the logic and plausibility of the CIA's Glomar response in light of all of the relevant evidence before it.**

Below, Mr. Connell argued that on the record before the district court—made up of declassified government documents, declarations from his military commission trial team, declassified materials from the military commissions, and declarations given by CIA officials in other FOIA cases—the CIA could not sustain its Glomar response as logical or plausible. He also maintained that the CIA and its authorized representatives had "officially acknowledged" information sufficient to imply the existence of documents responsive to his request and thereby waive the CIA's ability to assert Glomar.

The district court, however, collapsed both arguments into one: official acknowledgment. *See* Op. at JA489 & n.2. As explained above, official acknowledgment is a waiver doctrine. But even if an agency does not officially acknowledge information sufficient to waive its right to issue a Glomar response, it still must carry its burden to demonstrate that its use of Glomar is logical or plausible in light of the record. *See ACLU v. CIA*, 710 F.3d at 426; *see also Schaerr*, 69 F.4th at 926 ("An agency properly issues a Glomar response when its affidavits plausibly describe the justifications for issuing such a response, and these justifications are not substantially called into question by

contrary record evidence."); *Elec. Priv. Info. Ctr.*, 678 F.3d at 931 (requiring courts to consider all the record evidence in assessing whether a Glomar response is logical or plausible).

The Second Circuit has underscored this distinction, and explained at length why it is so important for courts to bear it in mind in Glomar cases. In *Florez*, the court examined a FOIA request, sent to the CIA, for all records concerning a former Cuban diplomat that the requester, the diplomat's son, surmised had been under CIA surveillance. 829 F.3d at 180. The agency responded with Glomar, based on its assertion that acknowledging the existence or nonexistence of records would reveal classified intelligence sources and methods, and the district court upheld the response. *Id.* at 181. While an appeal was pending, the FBI declassified and released several documents about the diplomat, *id.* at 182, and before the Second Circuit, the plaintiff argued that the FBI's disclosures had undermined the CIA's Glomar response.

The Second Circuit agreed that the FBI disclosures might have altered the district court's conclusion that the CIA's Glomar response was logical and plausible, and it remanded the matter for further examination of the response in light of the newly declassified documents. It explained that, notwithstanding that the documents emanated from an agency that was not

33

the CIA, the FBI's disclosures were "germane to the CIA's asserted rationale for asserting a Glomar response." *Id.* at 184. It further explained that the FBI documents were relevant evidence in the case because they had "appreciable probative value in determining, under the record as a whole, whether the justifications set forth in the CIA's declaration are logical and plausible." *Id.* at 184–85 (cleaned up). It did so even though the FBI documents did not "reveal the CIA's activities or involvement" in any monitoring of the subject of the request, but merely because they might "bear" on the "reasonableness, good faith, specificity, and plausibility" of the CIA's justification. *Id*. at 185–86.

The court specifically rejected the argument "that, under the official acknowledgment doctrine, the disclosures of other federal agencies— regardless of the extent to which they bear on the validity of another agency's Glomar rationale—are never relevant and must be wholly disregarded." *Id.* at 186. And it rejected the dissent's "exclusive reliance on the official acknowledgment doctrine to create out of whole cloth a rule limiting the evidence a district court may consider in a Glomar inquiry." *Id.* at 187. It concluded by explaining that "[i]t defies reason to instruct a district court to deliberately bury its head in the sand to relevant and contradictory record evidence solely because that evidence does not come from the very same

agency seeking to assert a Glomar response in order to avoid the strictures of FOIA." *Id.* (citing *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).

The district court in this case, though, did close its eyes to the evidentiary value of a great deal of material submitted by Mr. Connell below. The weight of that evidence, as discussed below, undermines the CIA's justification for its Glomar response.

C. <u>The record establishes that the CIA had at least some measure of operational control over Camp VII between September 2006 and January 2007, and it is neither logical nor plausible to conclude otherwise.</u>

There is not a shred of doubt that the CIA maintained some measure of operational control over detainees at Camp VII during the relevant time period.

<u>SSCI Report</u>

Most centrally, the SSCI Report, which, again, formed the explicit basis of Mr. Connell's request, made the CIA's operational control clear as day: "After the 14 CIA detainees arrived at the U.S. military base at Guantánamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA." SSCI Report at JA114. The Report cited the same CIA background memorandum that the CIA produced in

heavily redacted form as responsive to Mr. Connell's request. Background Mem. at JA303–05; Expanded Background Mem. at JA316–43.

The district court concluded that the SSCI Report does not count. Op. at JA491. It reasoned that, at most, the SSCI Report acknowledges "the fact that the SSCI read the Background Memo cited at footnote 977 to imply CIA 'operational control' over the fourteen detainees." *Id*. And, applying the "official acknowledgment" test, it likened the SSCI's reading of the full, unredacted background memorandum to public speculation. *See id.* at JA492 (referring to a quotation in *Knight*, 11 F.4th at 816, about how only official confirmation from "the agency itself would remove lingering doubts" about its authenticity and veracity).

But the district court missed the significance of the report when it comes to evaluating whether the CIA's Glomar response is logical or plausible *independent* of the "official acknowledgment" test. Like the FBI documents in *Florez*, the SSCI Report is relevant evidence in this case. So are declarations describing the genesis of the report filed by the CIA itself in other FOIA litigation (and filed as exhibits below in this case). *See* Higgins Decl. at JA246–68; Lutz Decl. at JA269–94. Unlike the district court, the SSCI had access to the full contents of the background memo to which the report cited. Higgins Decl.

at JA250 ¶ 11.[73] The SSCI also revised its report to address issues raised in a lengthy CIA reply to an initial draft. *Id.* at JA254–55 ¶ 17. It then permitted the executive branch, led by the President and the Director of National Intelligence—"the head of the intelligence community," 50 U.S.C. § 3023(b)(1)—to, "in consultation with other Executive Branch agencies, conduct[] a declassification review" of the document before releasing it. Lutz Decl. at JA271–72 ¶ 6.

So the SSCI read the full classified background memo, concluded that the memo indicated that the CIA had (at least some measure of) operational control over Camp VII, documented its understanding, sent its conclusion to the executive branch (including the CIA) for a declassification review, and published it, with the President's blessing.[74] Maybe the SSCI overstated the meaning of the background memo. But to determine that the CIA's Glomar response is logical or plausible notwithstanding the report, a court would have to conclude that the SSCI got it so wrong as to infer that the CIA had *some* operational control where there was *none*, and that despite all the process

---

[73] It also had access to and reviewed more than six million pages of records from the intelligence community. Brinkmann Decl. at JA244.

[74] Lutz Decl. at JA271–72 ¶¶ 5–6; Higgins Decl. at JA248 ¶ 4, JA253–56 ¶¶15–20.

involved before the report was published, it never felt the need to correct itself. It strains credulity to conclude that the report has no bearing on the "reasonableness, good faith, specificity, and plausibility" of the CIA's justification. *Florez*, 829 F.3d at 185–86.

The SSCI Report contains other declassified details, as well, that undermine the CIA's Glomar response. For example, the report indicates that prior to the time period in question, the CIA operated multiple detention sites at Guantánamo. *See* SSCI Report at JA112 n.848. Further, the report mentions a "third CIA detention facility, DETENTION SITE RED," and while the remainder of the sentence is redacted, the citation that follows it includes a September 2006 "Memorandum of Agreement" between DOD and the CIA. *Id.* By its mere existence and relevance to CIA detention at Guantánamo, the citation suggests some kind of ongoing CIA role.[75] The report also cites to CIA documents, including a site daily report and cable,[76] when discussing the government's treatment of detainee Ramzi bin al Shibh after his arrival at Camp VII. SSCI

---

[75] The unredacted contents of the Memorandum of Agreement itself are discussed below, in the next subsection.

[76] SSCI Report at JA111 & nn.427–28; Pradhan Decl. at JA151 ¶¶ 6–8. A prosecutor in the 9/11 military commissions case has acknowledged on the record on at least two separate occasions that such CIA site daily reports exist. Pradhan Decl. at JA153–54, JA155–56; *see also* Mil. Comm'n Tr. at JA182–84.

Report at JA111 & nn.427–28; Pradhan Decl. at JA151 ¶¶ 6–8; Aftergood Decl. at JA233 ¶ 8.

To read the SSCI Report, and take seriously the context and process that produced it, and then conclude that it is a secret whether the CIA has records related to the topic—after the agency already released to Mr. Connell three unclassified records responsive to his request—is neither logical nor plausible.

Other Declassified Documents

"But there is more." *ACLU v. CIA*, 710 F.3d at 430. The record also reflects other declassified information that further undermines the CIA's Glomar response.[77]

First, before Mr. Connell filed his FOIA request, the CIA released the September 2006 "Memorandum of Agreement" between DOD and the CIA cited in the SSCI Report. The document explains that it "sets out the duties and responsibilities" of the two agencies concerning the government's detention at

---

[77] Because the district court simply evaluated those documents under the test for official acknowledgment, it failed to give any evidentiary weight whatsoever to even a single one of them. *See* Op. at JA493–94.

Camp VII. DOD–CIA MOA at JA345.[78] It is signed by Donald Rumsfeld, then–

Defense Secretary, and Michael Hayden, then–Director of the CIA. *Id.* at JA352.

The document is heavily redacted, and what is visible mostly discusses DOD's

role vis-a-vis the detainees. But even beyond the mere and telling fact that it

exists, the document still makes clear that the CIA had some operational role

over Camp VII. For instance, the memo requires the two agencies to

"coordinate with one another with regard to all communications with

Congress on matters and activities covered by" the document. *Id.* at JA351. It

also requires them to "coordinate . . . on all public affairs matters and, as

necessary, [with] other US agencies." *Id.* at JA352. It is hard to imagine the

need for a document like this—whatever it says—if the CIA had no measure of

power or authority at all at Camp VII. To the contrary, it was a central player,

and at least a partner with DOD in its operation.

Second, two additional documents, obtained almost ten years ago by the

American Civil Liberties Union from the Office of the Director of National

Intelligence ("ODNI") through FOIA requests, further illuminate the CIA's

central involvement in decision making over Camp VII detainees. *See*

---

[78] In testimony before the military commission, the first Camp VII commander confirmed that this memorandum related to detainees held in Camp VII. Mil. Comm'n Tr. at JA417.

Interagency Meeting Agenda at JA356; Interagency Meeting Mem. at JA359–60; Connell Decl. at JA297 ¶ 12.[79] The "Memorandum for Record" described a November 29, 2006 interagency meeting between staff from the National Security Council, DOD, the State Department, DOJ, the CIA, and ODNI where the participants "discuss[ed] several security issues concerning the 14 High Value Detainees" held at Camp VII. Interagency Meeting Mem. at JA359. The memo indicates that the participants reached a "[c]onsensus" on several issues, and that certain individuals working on Camp VII detainee issues would require "CIA codeword" security clearances. *Id.*

Third, another declassified document includes an itinerary and a background memorandum for a visit by CIA Director Hayden to Guantánamo Bay in December 2006. Background Mem. at JA303–05; Expanded Background Mem. at JA316–43. The document includes two pages about Camp VII, which the memorandum refers to as the "Guantánamo Bay High-Value Detainee Detention Facility." Background Mem. at JA304–05; Expanded Background Mem. at JA319–20. It also includes information about the CIA and DOD's respective roles at the facility, including that the "CIA's end game is to assist

---

[79] *See also* ACLU Torture Database, Agenda Re: Interagency Decisions Needed Regarding the 14 High Value Detainees (Nov. 21, 2006) (released on Oct. 31, 2014), https://www.thetorturedatabase.org/document/agenda-re-interagency-decisions-needed-regarding-14-high-value-detainees.

DOD in any way possible in the Military Commission process, while at same time protecting CIA equities." *Id*. at JA320. The memorandum also includes over a dozen pages of information about the detainees held at Camp VII. *Id*. at JA323–43. Critically, the SSCI cited this document in its footnote to support its conclusion that the CIA maintained operational control over Camp VII. SSCI Report at JA114. And the CIA produced this document to Mr. Connell as responsive to his request.

In light of these documents, which directly concern the extent of the CIA's operational control over Camp VII, it is neither logical nor plausible for the CIA to assert a Glomar response.

Military Commissions Materials

"And there is still more." *ACLU v. CIA*, 710 F.3d at 430. Because Mr. Connell represents Mr. al-Baluchi before the 9/11 military commission, he and his defense team colleagues have had a great deal of experience navigating materials related to his client's detention and treatment at Camp VII. Connell Decl. at JA295–99; Zittritsch Decl. at JA78–84; Pradhan Decl. at JA150–57. And because the measure of the CIA's operational control over Camp VII has been a heavily litigated topic in the Guantánamo military commissions,[80] unclassified

---

[80] *See, e.g.*, Mot. to Compel at JA161; Mil. Comm'n Tr. at JA179; Jan. 2022 Discovery Order at JA228; Mil. Comm'n Tr. at JA438; Mar. 2022 Discovery

materials from the military commissions also shed light on the logic or plausibility of the CIA's Glomar response.

First, defendants in the 9/11 case have brought motions to compel discovery related to the CIA's role at Camp VII, including CIA records about the treatment of the detainees there. Mot. to Compel at JA161, JA164; Mil. Comm'n Tr. at JA179, JA438. In opposing those motions, the government did not treat the "existence or nonexistence" of records about that role as classified or otherwise protected.[81] In fact, the government admitted that relevant CIA documents exist. In a hearing on one of the motions to compel, the presiding judge stated:

> [I]t sounds like, the testimony from the camp commander and some of the other *documentation*, shows there was an MOU, there was some overlap, there was some mixing; and so that becomes in dispute, the amount of CIA involvement . . . it should go to the defense so that they can then look at the *CIA documents* to determine, hey, this helps our argument that CIA was exerting control, was having some type of supervisory action . . . . [V]ersus . . . if the documents . . . are simply regurgitating what were already in DOD medical records, it seems that the

---

Order at JA476. Although both motions to compel have been granted, litigation continues before the military commission on the scope of the government's discovery obligations under the orders.

[81] Gov't Opp., *United States v. Mohammad et al.*, AE 711A (U.S. Mil. Comm'n Feb. 4, 2020), https://www.mc.mil/Portals/0/pdfs/KSM2/ KSM%20II%20(AE711A(Gov)).pdf; Gov't Opp., *United States v. Mohammad et al.*, AE 779A (U.S. Mil. Comm'n Apr. 1, 2020), https://www.mc.mil/Portals/0/ pdfs/KSM2/KSM%20II%20(AE779A(Gov)).pdf.

> government would want to give those to the defense and foreclose that argument.

Mil. Comm'n Tr. at JA212–13 (emphasis added). And the prosecutor—

who represents CIA interests at Guantánamo, *see* Zittritsch Decl. at JA82

¶ 8; Connell Decl. at JA295 ¶ 5—responded, "that may well be true, but

in this case, that's not what *those documents* do." *Id.* (emphasis added).

That response is not a model of clarity, but the important point is that

the judge and the government were openly discussing responsive

records: the prosecutor did not clam up, the CIA did not stop the

hearing, and the government did not redact the transcript. Ultimately,

the military judge granted both motions to compel and discovery about

the CIA's role at Camp VII remains ongoing.[82]

Second, the government has provided "written classification guidance"

to the defense teams in the 9/11 military commission "over various matters,

including CIA operational control over Camp 7." *Id*. at JA83 ¶ 14. But this

guidance does not treat the "existence or nonexistence" of information about

the CIA's role at Camp VII as classified information. As the Defense

Information Security Officer ("DISO") for Mr. Connell's defense team—who is a

government employee, *Id*. at JA78 ¶ 2—explained:

---

[82] Jan. 2022 Discovery Order at JA228; Mar. 2022 Discovery Order at JA476.

An unclassified paragraph of the current written classification guidance provides that while the statement regarding operational control on page 160 of the redacted Executive Summary is unclassified, specifics of the operational control are classified. Neither this paragraph nor any classification guidance to which I have access states that the existence of specifics regarding CIA operational control of Camp 7 (as opposed to the specifics themselves) is classified. Indeed, the classification guidance regarding the classification of specifics is itself unclassified.

*Id.*; *accord* Pradhan Decl. at JA157 ¶ 15; Connell Decl. at JA295–96 ¶¶ 4–8.

Third, various transcripts of military commission hearings bear on this case. Before being released to the public, those transcripts must undergo a classification review by multiple "Original Classification Authorities" at different executive branch agencies. Zittritsch Decl. at JA84 ¶¶ 18–19. The Office of Military Commissions has explained that "[r]eview of the draft transcript is a coordinated, interagency process."[83] And with respect to filings, before they can be made public, a DISO, who "maintain[s] a reference collection of all classification guidance,"[84] examines the document and "if necessary, forwards it for classification review."[85]

---

[83] Pub. Tr. Process at JA148.

[84] Zittritsch Decl. at JA78–9 ¶ 5.

[85] *Id*. at JA83–84 ¶ 17.

At one hearing, the parties discussed the SSCI Report's reference to a CIA site daily report sent about one of the Camp VII detainees after his arrival. The prosecutor confirmed on the record on two separate occasions that CIA site daily reports exist. Mil. Comm'n Tr. at JA182–84, 209, 216.

At another hearing, a military commissions prosecutor called his own witness on the question of CIA operational control: the first commander at Camp VII. Mil. Comm'n Tr. at JA363–64. The commander testified that he first received information about his mission in an "interagency meeting" and he acknowledged the existence of documents known as "summary of conclusions" that detailed interagency decisions. *Id.* at JA388–89, JA403–04; *see also id.* at JA194, JA472. He verified that Camp VII was his "duty station" as well as the "duty station of some other government agencies." *Id.* at JA408. He confirmed that in addition to personnel from DOD, "a representative from another Government agency" participated in daily meetings about Camp VII. *Id.* at JA401. He testified that an interagency group decided bigger policy as well as certain operational issues related to Camp VII. *Id.* at JA399–400 (policy issues); *id.* at JA406–07 (operational issues like accommodating detainees' religious practices). He testified that while Camp VII guards

wore military uniforms, they were not from the military. *Id*. at JA411–

14.[86]

At another hearing, in an open session that could have been interrupted

on CIA secrecy grounds[87] but was not, the prosecutor asked the commander

directly whether he agreed with the SSCI Report's assessment that the CIA had

operational control over Camp VII. *Id*. at JA383. Far from declining to answer

on the grounds that information about CIA operational control (or the lack

thereof) was classified, the commander answered "No, sir." He briefly

explained that he understood "operational control" to mean "the authorities a

commander has over his or her assigned forces," and that he "had full

responsibility and authorities over . . . those forces." *Id*. Later, in a closed

session, the commander elaborated that "OPCON" is, "in the military jargon,"

used "to define a relationship between forces" and "the commander" of "those

---

[86] Given all of this, it's little wonder that the journalist who has, for more than a decade, most closely observed the military commissions at Guantánamo reads those transcripts as straightforwardly indicating a period of CIA operational control. *See* Rosenberg 4/21/22 ("Court testimony has shown that the C.I.A. controlled the prison for an undisclosed period and staffed it with guards who were civilians in military attire, apparently agency contractors.").

[87] Carol Rosenberg, *At Guantánamo's Court Like No Other, Progress is Frustrated by State Secrets*, N.Y. Times, May 30, 2023, https://www.nytimes.com/2023/05/30/us/politics/guantanamo-classified-secrets-indonesia-bali-bombing.html.

forces and how they interact and their responsibilities." *Id*. at JA429. But he also explained that he "believe[d] there[ were] two separate missions that went on there." *Id.* He said more, but it is redacted. *Id.*

True, in this testimony, the Camp VII military commander at the time appears to *deny* that the CIA had operational control.[88] But Glomar is supposed to protect *both* sides of the CIA's secret: whether the CIA has information going to a measure of operational control, or whether it does not.[89]

Finally, in the military commission of Abd al-Rahim al-Nashiri, who was also detained at Camp VII, the presiding judge made detailed findings of fact in an unclassified decision suppressing certain of Mr. al-Nashiri's statements

---

[88] Similarly, the district court read the unredacted portions of the memo cited in footnote 977 of the SSCI Report to essentially reject any notion of CIA operational control. Op. at JA492. Likewise, military commissions prosecutors in the military commissions have flatly denied the claim that the CIA was in "operational control" over Camp VII, Gov't Mot. to Reconsider, *9/11 Case*, AE 692 at 2 (U.S. Mil. Comm'n Jan. 13, 2020), https://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE692A(Gov)).pdf, and have insisted that DOD did, instead. Order at JA229.

[89] *See* Blaine Decl. at JA46 ¶ 34 ("For example, if the CIA were to confirm the existence of responsive records, such confirmation could reveal sensitive details about CIA's intelligence sources and methods and jeopardize the safety of the CIA employees and the employees of other agencies. Conversely, if the CIA denied having records responsive to this request, that response could provide adversaries with insight into the CIA's priorities, resources, capabilities, and relationships with other agencies.").

because they were tainted by CIA torture. Nashiri Op. at JA498–547. The judge found that although Mr. al-Nashiri was told "he was in the legal custody of the Department of Defense" and that "he would not return to his previous captors," he was "held separately from other detainees and 'remained under the operational control of the CIA.'" *Id.* at JA518 (quoting SSCI Report at JA114). The judge also found that the CIA was involved in the decision to give detainees "limited rights advisements" as opposed to *Miranda* warnings, and that the CIA gave input as to what rights would be included and excluded from the advisements. *Id.* at JA517–18, JA532–34.

The military commission materials are yet another important part of the record that cast doubt on the CIA's assertion that the existence or nonexistence of responsive documents is still plausibly a secret.

* * *

Neither the military commissions prosecutor, nor the Camp VII commander, nor the executive's classification authorities, nor a DOD-employed DISO, nor a military commission presiding judge have treated the "existence or nonexistence" of records related to CIA operational control to be a secret. Given that, it "beggars belief" that the CIA asks this Court to do so here. *ACLU v. CIA*, 710 F.3d at 431.

**III.    The CIA waived its ability to assert a Glomar response under the official acknowledgment doctrine.**

Not only is the CIA's Glomar response neither logical nor plausible, but the CIA additionally waived its ability to invoke Glomar under the official acknowledgment doctrine. An agency cannot maintain a Glomar response if a plaintiff shows, through "official[] and public[] acknowledge[ments]," that responsive records exist. *Leopold v. CIA*, 987 F.3d 163, 167 (D.C. Cir. 2021) (collecting cases). To defeat a Glomar response, a prior disclosure must confirm, directly or by implication, the existence or nonexistence of records responsive to the FOIA request, "since that is the purportedly exempt information that a Glomar response is designed to protect." *ACLU v. CIA*, 710 F.3d at 427; *see also Knight*, 11 F.4th at 813.

This Court's decision in *ACLU v. CIA* makes clear just how low this bar is. There, a FOIA request to the CIA sought agency records pertaining to the government's use of drones for the purpose of killing targeted individuals. 710 F.3d at 425. The Court concluded, based on multiple statements, that both the President and his counterterrorism advisor had officially acknowledged that "the United States has participated in drone strikes." *Id.* at 430. As the Court explained, the party issuing the Glomar response was "the Central *Intelligence* Agency," and it "strain[ed] credulity to suggest that an agency charged with

gathering intelligence affecting the national security does not have an 'intelligence interest' in drone strikes, even if that agency does not operate the drones itself." *Id.* Because it was clear the CIA had responsive records, the Glomar response did not survive the test of logic or plausibility. *Id.* at 431–32.

In this case, the district court reviewed each of the documents identified by Mr. Connell and concluded that none of those disclosures met the requirements of the official acknowledgment doctrine. Op. at JA490–95. But here, too, the district court's mistake lies in its conflation of the alleged secrets possibly contained in relevant CIA records with the secret protected by the Glomar response. Mr. Connell's FOIA request—as recognized by the CIA itself—seeks CIA documents going to the fact, and measure or extent, of the agency's operational control over detainees at Camp VII during the specified time period. *See supra* Section II.[90] The CIA has waived the right to protect the

---

[90] The district court alternatively held that the CIA's Glomar response is valid because, at most, the Plaintiff is only entitled to documents he specifically identified and that all such documents have been produced or are otherwise publicly available. Op. at JA495. That was wrong. The CIA's Glomar response does not protect the existence or nonexistence of specific documents, but any documents at all. *See, e.g.*, *ACLU v. CIA*, 710 F.3d at 432 (discussing a parallel FOIA request as to which the government had provided two responsive records and concluding that "official statements . . . render it impossible to believe that those two [responsive documents] are the only documents related to drone strikes in the Agency's files").

existence or nonexistence of such records by official acknowledgment.[91]

CIA Documents

CIA documents in the record include information about the measure or extent of CIA operational control over the detainees at Camp VII and waive the agency's Glomar response.

First, as discussed above in Section III, the Memorandum of Agreement between the CIA and DOD "sets out the duties and responsibilities" of the two agencies concerning the government's detention at Camp VII. DOD–CIA MOA at JA307. Although the CIA's role is mostly redacted, the document still makes clear that the CIA had some operational role at Camp VII. *See id.* at JA313 (requiring the CIA and DOD to "coordinate with one another with regard to all communications with Congress on matters and activities covered by" the document); *id*. at JA314 (requiring the CIA and DOD to "coordinate . . . on all public affairs matters and, as necessary, other US agencies."). Whatever else it says, it was cited in the SSCI Report, and the CIA produced it as responsive to Mr. Connell's request.

---

[91] Even if certain disclosures do not amount to official acknowledgments, the Court can still consider them because they "establish the context in which the most revealing document[s] . . . should be evaluated." *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 115 (2d Cir. 2014).

The district court disregarded all of this, holding that "none of the unredacted material [in the Memorandum of Agreement] discusses the CIA's role or activities under the MOA, let alone acknowledges the agency's operational control of Camp 7." Op. at JA493. That characterization gets it doubly wrong. The document does discuss the CIA's role with respect to communications with Congress and public affairs regarding Camp VII, and both of those functions fall within general Camp VII operations. Beyond that, the district court took "operational control" as a defined, binary concept, when the entire purpose of Mr. Connell's request was to obtain documents that illustrated the extent of the agency's involvement at Camp VII. *See* Connell Clarification at JA63 ("I am seeking to determine what 'operational control' means.").

Second, the itinerary and background memorandum prepared for the CIA Director's visit to Guantánamo also discloses information about the measure of the CIA's operational control over Camp VII. While most of the information going to the CIA's role at Camp VII is likely in the redacted portion of the document, the memorandum does provide that the "CIA's end game is to assist DOD in any way possible in the Military Commission process, while at same time protecting CIA equities." Expanded Background Mem. at JA320. The district court disregarded the document entirely because the portions without

redactions "do not acknowledge the CIA's operational control over Camp 7." Op. at JA492. Again, the district court focused on the wrong thing. Mr. Connell's FOIA request encompasses the extent of the CIA's operational control, or in the CIA's words, the "relationship" between the CIA and operational control over Camp VII. Blaine Decl. at JA40 ¶¶ 19, 20. That a document does not acknowledge a *specific kind* of control does not mean it does not acknowledge *some measure* of control more generally. And besides, it was the foundation for the SSCI Report's conclusion regarding the CIA's operational control over Camp VII.

<u>SSCI Report</u>

The CIA disclosures are clear official acknowledgments and independently establish waiver here. But the Court should also consider relying on the public disclosures found in the SSCI Report to conclude that the CIA has waived its ability to assert a Glomar response.

This Court has held that a disclosure cannot be official if it is "made by someone other than the agency from which the information is being sought." *Knight*, 11 F.4th at 816 (quoting *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999)). But as *Knight* acknowledges, that rule may not be as ironclad as it seems. For example, one component of an executive agency can bind another component of the same agency. *See id.* And the President, including his

54

advisors, can bind executive agencies through official acknowledgements. *See id.* at 817 (citing *ACLU v. CIA*, 710 F.3d at 429 n.7) (concluding that a statement by the President's counterterrorism advisor constituted an official acknowledgment sufficient to waive the CIA's Glomar response).

Further, the Supreme Court recently reasoned in a "roughly" analogous context that when contractors for an agency play a "central role in relevant events," their disclosures are "tantamount to a disclosure from the [agency] itself." *United States v. Zubaydah*, 142 S. Ct. 959, 970–71 (2022). And this Court has held, with respect to the disclosure of information subject to a protective order, that court orders and statements by "an officer of the court" can be "tantamount to, and a sufficient substitute for, official acknowledgment by the U.S. government." *Ameziane v. Obama*, 699 F.3d 488, 493 (D.C. Cir. 2012).

In these cases, there was something about the nature of the disclosing parties that made their disclosures imputable to the agencies in question. The contractors in *Zubaydah* played a central role in the relevant events. And in *Ameziane*, this Court recognized that because officers of the court are "subject to the serious ethical obligations inherent in that position," their disclosures are different than those made by other third parties. 699 F.3d at 493. As such, they were "in a position to know . . . officially," *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975), and their "confirmation may dispel 'lingering

doubts' or reveal that the information currently in the public domain is incomplete or itself a cover story." *Zubaydah*, 142 S. Ct. at 970 (quoting *Mil. Audit Project*, 656 F.2d at 744–45).

Like in those cases, here there is good reason to rely on the public disclosures about the CIA's measure of operational control contained in the SSCI Report. The CIA played a central role in the report: the SSCI revised the report to address issues raised in the CIA's reply to an initial draft, *see* Higgins Decl. at JA254 ¶ 17, and the CIA and the Director of National Intelligence, in consultation with other executive branch agencies, conducted a declassification review, *see* Lutz Decl. at JA271 ¶ 6. And the circumstances surrounding the report, including that it took more than three years to write and involved the review of over six million pages of records from the intelligence community,[92] suggest that its disclosures carry sufficient weight to make them official.

* * *

In sum, not only is the CIA's Glomar response not logical or plausible in light of the record, but the CIA also waived its right to assert a Glomar response. Its own documents reveal that the agency had a measure of

---

[92] Brinkmann Decl. at JA244.

operational control over Camp VII, a fact which the disclosures in the SSCI

Report confirm. Put another way, "the secret is out," and so "there is no value

in a Glomar response." *Leopold*, 987 F.3d at 167 n.5.

## CONCLUSION

For the foregoing reasons, this Court should reject the CIA's Glomar

response, reverse the district court's judgment, and remand the case with

instructions to order the agency to search for all responsive records, to release

responsive records, and to justify any withholdings of other responsive

information or records.

Date: October 12, 2023

Respectfully submitted,
*/s/ Brett Max Kaufman*

Arthur B. Spitzer
D.C. Bar No. 235960
ACLU Foundation of the District
  of Columbia
915 15th Street NW
Washington, D.C. 20005
T: 202.601.4266
F: 202.457.0805
aspitzer@acludc.org

Brett Max Kaufman
Sara Robinson
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, New York 10004
T: 212.549.2500
F: 212.549.2654
bkaufman@aclu.org

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P.

    32(a)(7)(B) because it contains 12,308 words, excluding the parts of the

    brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App.

    32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

    because it has been prepared in a proportionally spaced and easy-to-

    read typeface using Microsoft Word in 14-point size font.

>                    */s/ Brett Max Kaufman*
>                    Brett Max Kaufman
>                    Counsel for Plaintiff–Appellant
>
>                    Date: October 12, 2023

**CERTIFICATE OF SERVICE**

On October 12, 2023, I served upon the following counsel for

Defendant–Appellee one copy of Plaintiff–Appellant's BRIEF FOR PLAINTIFF–

APPELLANT via this Court's electronic-filing system:

Jane M. Lyons
U.S. Attorney's Office, Civil Division
601 D Street, NW
Washington, DC 20530
T: 202.252.2500
jane.lyons@usdoj.gov

Thomas Gary Pulham
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530
T: 202.514.2000
thomas.pulham@usdoj.gov

Sharon Swingle
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530
T: 202.514.2000
Sharon.Swingle@usdoj.gov

*/s/ Brett Max Kaufman*
Brett Max Kaufman
Counsel for Plaintiff–Appellant

Date: October 12, 2023

# ADDENDUM

FOIA (Selected Provisions), 5 U.S.C. § 552 ………………………………  A-2

Director of National Intelligence, 50 U.S.C. § 3023 ……………………...  A-5

**5 U.S.C. § 552**       **Public information; agency rules, opinions, orders, records, and proceedings**

[Selected subsections provided; omissions denoted by "***"]

**(a)** Each agency shall make available to the public information as follows:

***

> **(3)(A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person**.**

***

> **(4)**

***

> > **(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

\*\*\*

**(b)** This section does not apply to matters that are—

> **(1)**
>> **(A)** specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

> **(2)** related solely to the internal personnel rules and practices of an agency;

> **(3)** specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

>> **(A)**
>>> **(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

>>> **(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

>> **(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

> **(4)** trade secrets and commercial or financial information obtained from a person and privileged or confidential;

> **(5)** inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

> **(6)** personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

**(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

**(8)** contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

**(9)** geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

\*\*\*

**50 U.S.C. § 3023          Director of National Intelligence**

**(a) Director of National Intelligence**

(1) There is a Director of National Intelligence who shall be appointed by the President, by and with the advice and consent of the Senate. Any individual nominated for appointment as Director of National Intelligence shall have extensive national security expertise.

(2) The Director of National Intelligence shall not be located within the Executive Office of the President.

**(b) Principal responsibility**

Subject to the authority, direction, and control of the President, the Director of National Intelligence shall--

**(1)** serve as head of the intelligence community;

**(2)** act as the principal adviser to the President, to the National Security Council, and the Homeland Security Council for intelligence matters related to the national security; and

**(3)** consistent with section 1018 of the National Security Intelligence Reform Act of 2004, oversee and direct the implementation of the National Intelligence Program.

**(c) Prohibition on dual service**

The individual serving in the position of Director of National Intelligence shall not, while so serving, also serve as the Director of the Central Intelligence Agency or as the head of any other element of the intelligence community.