**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5118**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

JAMES G. CONNELL, III,

Plaintiff-Appellant,

v.

CENTRAL INTELLIGENCE AGENCY,

Defendant-Appellee.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLEE**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

SHARON SWINGLE
THOMAS PULHAM
  *Attorneys, Appellate Staff
  Civil Division, Room 7323
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-4332*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The parties before the district court and this Court are plaintiff-appellant James G. Connell, III; and defendant-appellee Central Intelligence Agency.  There are no amici.

## B.    Rulings Under Review

The ruling under review (issued by Judge Christopher R. Cooper) is an order dated March 29, 2023, granting summary judgment to defendant.  The memorandum opinion accompanying that order is available at 2023 WL 2682012.

## C.    Related Cases

This case has not previously been before this Court.  Counsel for the appellee is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Thomas Pulham*
Thomas Pulham

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION .................................................3

STATEMENT OF THE ISSUE ........................................................3

PERTINENT STATUTES AND REGULATIONS .........................3

STATEMENT OF THE CASE ..........................................................3

    A.    Statutory Background..............................................3

    B.    Factual Background.................................................8

    C.    Prior Proceedings .................................................14

SUMMARY OF ARGUMENT .........................................................16

STANDARD OF REVIEW...............................................................19

ARGUMENT ....................................................................................20

CIA's *GLOMAR* RESPONSE WAS PROPER....................................20

    A.    CIA Searched for and Produced Officially
          Acknowledged Records..........................................21

    B.    The Existence or Nonexistence of Other Records
          Relates to Intelligence Sources and Methods and Is
          Exempt from Disclosure.........................................23

    C.    The Information Protected by CIA's *Glomar* Response
          Has Not Been Officially Acknowledged. ...............29

D.    Various Government Records That Are Not Official Acknowledgments Do Not Foreclose CIA's *Glomar* Response. ..................................................................37

CONCLUSION ........................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*Afshar v. Department of State*,
    702 F.2d 1125 (D.C. Cir. 1983) ........................................................ 30

*American Civil Liberties Union v. CIA*,
    710 F.3d 422 (D.C. Cir. 2013) .......................................... 5, 6, 7, 38, 42

*American Civil Liberties Union v. CIA*,
    823 F.3d 655 (D.C. Cir. 2016) .......................................................... 8

*American Civil Liberties Union v. U.S. Dep't of Def.*,
    628 F.3d 612 (D.C. Cir. 2011) .......................................... 19, 40, 42, 46

*Ameziane v. Obama*,
    699 F.3d 488 (D.C. Cir. 2012) .......................................................... 34

*Bonner v. U.S. Dep't of State*,
    928 F.2d 1148 (D.C. Cir. 1991) ........................................................ 40

*CIA v. Sims*,
    471 U.S. 159 (1985) .......................................... 4, 24, 25, 26, 45, 47, 48

*DiBacco v. U.S. Army*,
    795 F.3d 178 (D.C. Cir. 2015) ...................................................... 5, 24

*Electronic Privacy Info. Ctr. v. National Sec. Agency*,
    678 F.3d 926 (D.C. Cir. 2012) .......................................................... 38

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) .................................... 15, 26, 30, 34, 43

*Florez v. CIA*,
    829 F.3d 178 (2d Cir. 2016) ...................................................... 41, 42

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) .................................................................. 4

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999) .......................................... 32, 35, 41, 43

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982) ........................................................ 28

*Goland v. CIA*,
607 F.2d 339 (D.C. Cir. 1978) ............................................ 44

*Hayden v. National Sec. Agency*,
608 F.2d 1381 (D.C. Cir. 1979) .......................................... 44

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989) ........................................................ 4

*Knight First Amendment Inst. at Columbia Univ. v. CIA*,
11 F.4th 810 (D.C. Cir. 2021) ............................. 18, 20, 21, 29, 30, 31,
32, 34, 35, 41, 42, 43, 44

*Larson v. Department of State*,
565 F.3d 857 (D.C. Cir. 2009) ................................... 5, 25, 26

*Leopold v. CIA*,
987 F.3d 163 (D.C. Cir. 2021) ............................... 7, 8, 21, 24

*Military Audit Project v. Casey*,
656 F.2d 724 (D.C. Cir. 1981) .................................... 43, 44

*Moore v. CIA*,
666 F.3d 1330 (D.C. Cir. 2011) ................... 8, 23, 30, 32, 36, 37, 44

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007) .................................... 23, 28

*Phillippi v. CIA*,
546 F.2d 1009 (D.C. Cir. 1976) ................................... 6, 31

*Public Citizen v. Department of State*,
11 F.3d 198 (D.C. Cir. 1993) ......................................... 30

*Salisbury v. United States*,
690 F.2d 966 (D.C. Cir. 1982) ............................... 34, 43, 46

*Schaerr v. U.S. Dep't of Justice*,
69 F.4th 924 (D.C. Cir. 2023) ............................. 20, 21, 22, 46

*United States. v. Zubaydah*,
595 U.S. 195 (2022) ................................................ 34

*Wolf v. CIA*,
473 F.3d 370 (D.C. Cir. 2007) .................... 6, 7, 15, 16, 17, 18, 19, 20, 23,
29, 30, 31, 33, 37, 38, 42, 44, 45

**Statutes:**

Freedom of Information Act (FOIA):
5 U.S.C. § 552(a)(3)(A) ................................................................ 4
5 U.S.C. § 552(a)(4)(B) ................................................................ 3
5 U.S.C. § 552(b) .......................................................................... 4
5 U.S.C. § 552(b)(1) ..................................................................... 4
5 U.S.C. § 552(b)(1)(A) ............................................................... 26
5 U.S.C. § 552(b)(3) .................................................................. 5, 23

28 U.S.C. § 1291 ........................................................................... 3

28 U.S.C. § 1331 ........................................................................... 3

50 U.S.C. § 3024(i)(1) ............................................................... 5, 24

**Regulatory Material:**

Exec. Order No. 13,526 (Dec. 29, 2009):
§ 1.1(a) ......................................................................................... 27
§ 1.1(a)(1) .................................................................................... 46
§ 1.1(a)(2) .................................................................................... 46
§ 1.1(a)(3) .................................................................................... 46
§ 1.4(c) ..................................................................................... 27, 46
§ 3.1(d) ..................................................................................... 47, 48
§ 3.6(a) ......................................................................................... 27

**Rule:**

Fed. R. App. P. 30(a)(1) .............................................................. 40

## GLOSSARY

| | |
|---|---|
| CIA | Central Intelligence Agency |
| DoD | Department of Defense |
| FBI | Federal Bureau of Investigation |
| FOIA | Freedom of Information Act |

## INTRODUCTION

In a report on the detention and interrogation program formerly carried out by the Central Intelligence Agency (CIA), the Senate Select Committee on Intelligence stated that 14 detainees transferred from CIA custody to the Department of Defense (DoD) "remained under the operational control of the CIA." JA160.

Plaintiff James Connell, an attorney representing a detainee before a military commission at Guantanamo Bay, wants to know what this phrase means and filed a FOIA request for documents relating to CIA's "operational control" over the facility where these detainees were held. After Connell added, in response to a request for clarification, a list of "possible topics" that interested him, CIA searched for responsive documents reflecting an unclassified or otherwise openly acknowledged relationship between the agency and the subject of the FOIA request. It released two documents with redactions and withheld one in full. But confirming or denying the existence of any other responsive documents—*i.e.*, documents that might reflect a classified or unacknowledged relationship between the agency and the subject matter of Connell's request—would disclose classified and statutorily

protected information.  The agency therefore issued a *Glomar* response

with respect to such documents, refusing to confirm or deny the

existence of any other responsive records.

This Court has held that an agency waives the ability to issue a

*Glomar* response with respect to a particular category of documents if

the agency has officially acknowledged whether or not such documents

exist.  CIA has not done so here.  Connell contends that an agency can

also be precluded from asserting a *Glomar* response if disclosures

falling short of official acknowledgment, including disclosures by other

government entities, appear to suggest agency involvement with the

activity that is the subject of the FOIA request.  He argues that, in this

situation, it is no longer a "secret" whether the agency has documents

related to the activity.

This Court has previously rejected this kind of end-run around the

strict rules governing official acknowledgment, and it should do so

again here.  CIA's invocation of Exemptions 1 and 3 to support its

*Glomar* response are justified by its declaration and have not been

waived by any official acknowledgment from that agency.  This Court

should affirm the district court's judgment.

## STATEMENT OF JURISDICTION

Connell invoked the district court's jurisdiction under 5 U.S.C.
§ 552(a)(4)(B) and 28 U.S.C. § 1331.  JA5.  The district court granted
summary judgment to CIA on March 29, 2023.  JA481.  A timely notice
of appeal was filed on May 25, 2023.  JA497.  This Court has
jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Connell sued CIA to compel the disclosure of documents relating
to the agency's "operational control" over detainees at the U.S. military
base at Guantanamo Bay.  The question presented on appeal is whether
CIA properly refused to confirm or deny the existence of any such
records beyond those that had been declassified or otherwise officially
acknowledged.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the
addendum to this brief.

## STATEMENT OF THE CASE

### A.  Statutory Background

**1.**  FOIA generally mandates disclosure of federal agency records
upon request, but the statute's disclosure requirement "does not apply"

to documents that fall within one of its enumerated exemptions.

5 U.S.C. § 552(a)(3)(A), (b).  These statutory exemptions reflect

Congress's judgment that "public disclosure is not always in the public

interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), because "legitimate

governmental and private interests" may be damaged by releasing

certain types of information, *John Doe Agency v. John Doe Corp.*, 493

U.S. 146, 152 (1989).  Courts must afford FOIA's exemptions

"meaningful reach and application" to preserve the statute's "workable

balance between the interests of the public in greater access to

information and the needs of the Government to protect certain kinds of

information from disclosure."  *Id.* at 152, 157; *see also Food Mktg. Inst.

v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (explaining that

the exemptions are "as much a part of FOIA's purposes and policies as

the statute's disclosure requirement" (alterations omitted)).

Under Exemption 1, FOIA's disclosure provisions do not apply to

classified matters—that is, matters that are "specifically authorized

under criteria established by an Executive order to be kept secret in the

interest of national defense or foreign policy" and "are in fact properly

classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).

Executive Order 13,526 currently governs classification of national security information. *See* Exec. Order No. 13,526 (Dec. 29, 2009).

Under Exemption 3, FOIA does not apply to matters that are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). The National Security Act of 1947, as amended, provides that the Director of National Intelligence "shall protect . . . intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The Director of National Intelligence has, in turn, "assign[ed] responsibility to intelligence agency heads to protect [their] intelligence sources and methods," bringing all such agencies within the scope of the National Security Act. *See DiBacco v. U.S. Army*, 795 F.3d 178, 196-99 (D.C. Cir. 2015). The National Security Act therefore exempts covered matters from disclosure under Exemption 3. *Larson v. Department of State*, 565 F.3d 857, 865, 868-69 (D.C. Cir. 2009).

**2.** Generally, when an agency receives a FOIA request, it must conduct a reasonable search for responsive records, produce the non-exempt portions of any responsive records, and provide an explanation of why any responsive records were withheld under applicable FOIA exemptions. *See American Civil Liberties Union v. CIA*, 710 F.3d 422,

426 (D.C. Cir. 2013). In certain circumstances, however, confirming or denying whether the agency has any responsive records may itself reveal information that is protected from public disclosure under one or more applicable FOIA exemptions. In those circumstances, an agency may properly refuse to confirm or deny whether it has any records responsive to the FOIA request. *Id.*

Neither confirming nor denying the existence or nonexistence of responsive records is generally referred to as a *Glomar* response. This term originates from a seminal FOIA case in which this Court upheld CIA's use of a "neither confirm nor deny" response to a FOIA request seeking records concerning reported contacts between CIA and the media regarding a large ship known as the *Hughes Glomar Explorer*. *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). A *Glomar* response is proper "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption" using "the general exemption review standards established in non-*Glomar* cases." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

**3.** "A requester can overcome an agency's otherwise valid *Glomar* response by showing that the agency has officially and publicly

acknowledged the records' existence." *Leopold v. CIA*, 987 F.3d 163,

167 (D.C. Cir. 2021). "[W]hen an agency has officially acknowledged"

information that is "otherwise exempt" from disclosure under FOIA,

"the agency has waived its right to claim an exemption with respect to

that information." *American Civil Liberties Union*, 710 F.3d at 426. In

order for a prior disclosure to constitute an "official acknowledgment,"

three criteria must be met: (i) "the information requested must be as

specific as the information previously released," (ii) the "information

requested must match the information previously disclosed," and (iii)

"the information requested must already have been made public

through an official and documented disclosure." *Wolf*, 473 F.3d at 378.

"The insistence on exactitude recognizes the Government's vital interest

in information relating to national security and foreign affairs." *Id.*

(quotation marks omitted).

In the *Glomar* context, the "specific information at issue" is the

existence *vel non* of agency records responsive to a particular request

for information. *Wolf*, 473 F.3d at 379. Thus, a plaintiff satisfies the

official acknowledgment test only "if the prior disclosure establishes the

*existence* (or not) of records responsive to the FOIA request." *Id.* In

other words, "to overcome an agency's *Glomar* response based on an official acknowledgment, the requesting plaintiff must pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011). "This test is 'strict.'" *Leopold*, 987 F.3d at 170.

## B.  Factual Background

**1.**  As part of its oversight of the intelligence community, the Senate Select Committee on Intelligence conducted a review of the detention and interrogation program formerly carried out by CIA.  *See generally American Civil Liberties Union v. CIA*, 823 F.3d 655, 659-61 (D.C. Cir. 2016).  At the end of that review, the Committee produced a voluminous report, running nearly 7,000 pages long, and an Executive Summary that itself was over 500 pages.  *Id.* at 660-61.  The Committee released a minimally redacted version of the Executive Summary that had been declassified by the Director of National Intelligence, but the full report remains classified and has never been publicly released.  *Id.*

One portion of the Executive Summary discusses the transfer in September 2006 of 14 detainees from CIA custody to the DoD.  The

Committee stated that "[a]fter the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA."  JA114.  This sentence is followed by a footnote citing "CIA Background Memo for CIA Director visit to Guantanamo, December [redacted], 2006, entitled Guantanamo Bay High-Value Detainee Detention Facility."  JA114 n.977.  The facility where these 14 detainees were held is known as Camp VII.  JA482.

    **2.**  Plaintiff James Connell is a defense attorney for Guantanamo detainee Ammar Al Baluchi in his trial before a U.S. military commission.  JA295.  Seeking information that could be of use in that proceeding, Connell submitted a FOIA request to CIA on May 23, 2017.  JA5-6.  The request began with the sentence quoted above from the Senate Committee's report.  Connell then asked for "any and all information that relates to such 'operational control' of the CIA over Guantanamo Bay detainees including but not limited to the document cited in the footnote 977."  JA58.

    CIA responded with a request for clarification, specifically asking for "the aspects of operational control that interest you, as well as a

specific . . . period of time you would like us to search." JA62. Connell replied that he was "seeking to determine what 'operational control' means" and provided, "[b]y way of example," a "list of possible topics" that he would be interested in:

(1) Whether CIA "operational control" included only Camp 7 or extended to other facilities such as Echo 2;

(2) What organization had decision-making authority over Camp 7;

(3) Whether CIA 'operational control' ended before or after 31 January 2007;

(4) Whether the 'operational control' involved CIA personnel, whether employees or contractors;

(5) Any detainee records maintained by the CIA during the period of 'operational control,' such as Detainee Inmate Management System records or the equivalent;

(6) How other agencies would obtain access to detainees during the period of 'operational control['], such as a Memorandum of Understanding with the Federal Bureau of Investigation or Criminal Investigative Task Force;

(7) How the facilities transitioned from CIA 'operational control' to DOD 'operational control.'

JA63. Connell specified that he was interested in documents from "1 September 2006 to 31 January 2007." JA63.

Understanding Connell to have amended his request along these lines, CIA responded in September 2020. The agency provided one

partially redacted three-page document, which it noted had been

previously released, and stated that it could neither confirm nor deny

the existence of any other records responsive to the request.  JA6822.

Connell filed an administrative appeal.  JA70.

CIA provided a final response to Connell's request in July 2021.

The agency explained that it had searched "for records that would

reveal an unclassified or openly acknowledged association between the

Agency and the subject of [the] request" and that it had located three

documents.  JA73.  Two were released with redactions and one was

withheld in full.  JA73.  The two released documents were (1) a

proposed itinerary and memorandum relating to a visit by the CIA

Director to Guantanamo Bay in December 2006; and (2) a memorandum

of agreement between the DoD and CIA concerning the "detention by

DoD of certain terrorists at a facility at Guantanamo Bay Naval

Station."  JA307-43 (altered formatting); *see also* JA485.[1]  With respect

to any records that may reveal a classified connection between the

---

[1] The first document was an expanded version of the three-page
document that had previously been released to Connell.  JA296.

agency and the subject of Connell's request, CIA again issued a *Glomar* response.  JA74.

The basis for the *Glomar* response was laid out in a sworn declaration by Vanna Blaine, a senior CIA official and original classification authority.  The declaration explained that the "confirming or denying the existence or nonexistence" of records reflecting a classified or otherwise publicly unacknowledged connection between the agency and the subject of Connell's FOIA request would reveal "intelligence sources and methods information that is protected from disclosure" by Exemptions 1 and 3.  JA43.

With respect to Exemption 1, the declaration stated that "the existence or nonexistence" of such records "is a properly classified fact" relating to "intelligence activities" and "intelligence sources and methods."  JA45.  For example, either a confirmation or a denial that such records exist (or do not exist) "would reveal sensitive information about the CIA's intelligence interests, personnel, capabilities, authorities, and resources" that is protected by Executive Order 13,526. JA47.  Adversaries such as "[t]errorist organizations, foreign intelligence services, and other hostile groups use such information to

thwart CIA activities and attack the United States and its interests."
JA46. Moreover, "[t]hese groups search continually for information
regarding the activities of the CIA" and are able to piece together and
make use of "seemingly disparate pieces of information" "from a myriad
of sources." JA46. To prevent "the potential for such damage to
national security, and to be credible and effective," the declaration
explained, "the CIA must use the Glomar response consistently,"
regardless of whether responsive documents exist or not. JA47.
Otherwise, the *Glomar* response would be interpreted as an admission
one way or the other and "would reveal the very information" that must
be protected. JA48.

With respect to Exemption 3, the declaration explained that
"acknowledging the existence or nonexistence of records reflecting a
classified or otherwise unacknowledged connection to the CIA in this
matter would reveal information that concerns intelligence sources and
methods." JA49. Such information is protected from compelled
disclosure by the National Security Act. JA49. Accordingly, "the fact of
the existence or nonexistence of responsive records" is covered by

Exemption 3, which applies "independently and co-extensively to protect CIA's intelligence sources and methods from disclosure." JA49.

## C. Prior Proceedings

CIA moved for summary judgment. Connell "accept[ed] the redactions within the two documents released in part by the CIA," Dkt. No. 7, at 2, and conceded in his opposition that the agency had properly withheld the third document in whole, Dkt. No. 23, at 6 n.4. The only remaining dispute for decision was the propriety of the *Glomar* response. JA485.

The district court granted CIA's motion for summary judgment. The court observed that Connell's opposition relied solely on his assertion that "the agency has declassified the intelligence connection between [the] CIA and Guantanamo Bay's Camp VII and [officially acknowledged] the existence of responsive documents about that connection." JA489 (quotation marks omitted) (alteration in original). The court was skeptical of Connell's argument that declassification could undermine a *Glomar* response without application of the official acknowledgment test. JA489 n.2. And the Court "reject[ed] th[e] argument" that, in light of the declassification, the CIA's rationale for

invoking Exemptions 1 and 3 was no longer logical or plausible. JA489

n.2 (quotation marks omitted); *see also* JA495 (concluding that "the

Blaine Declaration 'logically' and 'plausibly' supports the response

under FOIA Exemptions 1 and 3"). In doing so, the court explained that

"[t]he fact that information resides in the public domain does not

eliminate the possibility that further disclosures can cause harm to

intelligence sources, methods and operations." JA489 n.2 (quoting

*Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990)).

The district court then applied the official acknowledgment test to

the various documents Connell relied on and concluded that "none of

the materials referenced constitute a public acknowledgment by the

CIA of the existence of documents concerning the agency's purported

operational control of Camp 7." JA494. As a result, the agency had not

"waived its ability to assert a *Glomar* response" to Connell's request.

JA495.

Finally, the district court noted that even if CIA had

"acknowledged its operational control of Camp 7 by declassifying one or

more of the documents Connell cites, the agency's *Glomar* response

would still be valid." JA495. The court noted that, in *Wolf*, 473 F.3d at

370, this Court held that CIA had partly waived a *Glomar* response through a former Director's testimony that included direct quotations from responsive records.  JA495 (citing *Wolf*, 473 F.3d at 378-79).  But this Court "went on to find . . . that the 'official acknowledgment waiver relate[d] only to the existence or nonexistence of the records . . . disclosed by [the former Director's] testimony.'"  JA495 (alterations in original) (quoting *Wolf*, 473 F.3d at 379).  "Applying *Wolf* here," the district court reasoned, if any of the documents Connell relies on "triggered a public acknowledgement waiver, then he would be entitled to an acknowledgement of the existence of those specific documents 'but not any others."  JA495 (quoting *Wolf*, 473 F.3d at 379).  Because all of those documents "have been produced to Connell or are otherwise publicly available," the agency's *Glomar* response was valid.

## SUMMARY OF ARGUMENT

Connell submitted a FOIA request for documents relating to what a Senate Committee characterized as CIA's "operational control" of a particular detention facility (Camp VII) at Guantanamo Bay over a five-month period.  The agency searched for and processed officially acknowledged records and issued a *Glomar* response with respect to any

other documents that could reveal a classified or otherwise unacknowledged connection between CIA and the "operational control" of the facility during that time. This Court has previously approved the use of a *Glomar* response in this kind of situation. *See Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007).

The existence or nonexistence of any additional, unacknowledged records is a classified, statutorily protected fact exempt from compelled disclosure. The request sought documents that revealed not only whether CIA exerted "operational control" over Camp VII, but also details about the agency's role there, including how broadly it reached, who carried it out, when and how it might have ended, and which other organizations were involved. CIA's declaration explained that confirming or denying the existence (or nonexistence) of such documents would reveal information related to the agency's intelligence sources and methods. This information falls within the scope of the National Security Act, 50 U.S.C. § 3024(i)(1), and is therefore protected by Exemption 3.

The agency's *Glomar* response is also independently supported by Exemption 1. A senior CIA official with original classification authority

explained that the information protected by the *Glomar* response is properly classified because it pertains to intelligence activities, sources, and methods, and its disclosure could reasonably be expected to cause harm to the national security. For both exemptions, the agency's explanation was "logical" and "plausible," especially when "taking into account the deference due to the Executive Branch in this area." *Knight First Amendment Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 819-20 (D.C. Cir. 2021).

This Court has held that an agency may be compelled to disclose information that is otherwise covered by a FOIA exemption if the information has been "officially acknowledged." *Wolf*, 473 F.3d at 378. This doctrine does not apply here because none of the prior disclosures invoked by Connell satisfy the "strict" requirements for official acknowledgment in the *Glomar* context—*i.e.*, that information previously released by the same agency from which records are sought confirms the existence or nonexistence of records subject to the *Glomar* response.

Connell contends that disclosures short of official acknowledgment can also foreclose a *Glomar* response. But this Court has previously

rejected similar attempts to evade the requirements for official acknowledgment, and the outcome Connell advocates for would be inconsistent with every case in which this Court has strictly applied those requirements. Regardless, CIA's *Glomar* response here remains logical and plausible even if Connell were correct that other documents established that the agency had "some measure of operational control" over detainees during the relevant time period. Br. 19. None of these documents undermine the agency's assessment that revealing a previously unacknowledged relationship between CIA and the "operational control" of the detention facility would disclose information relating to intelligence sources and methods. And this Court has "repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject." *American Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011).

## STANDARD OF REVIEW

This Court reviews de novo an agency's invocation of FOIA Exemptions 1 and 3 to support a *Glomar* response. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

# ARGUMENT

## CIA'S *GLOMAR* RESPONSE WAS PROPER.

A *Glomar* response allows the Government to "refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under [a] FOIA exception." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). In reviewing a *Glomar* response, courts apply "the general exemption review standards established in non-*Glomar* cases." *Id.* This means that "[a]gencies may carry their burden of proof through declarations explaining why a FOIA exemption applies," *Knight First Amendment Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 818 (D.C. Cir. 2021), and that courts must give "substantial weight to an agency's affidavit" and "not second-guess its conclusions even when they are speculative to some extent." *Schaerr v. U.S. Dep't of Justice*, 69 F.4th 924, 930-31 (D.C. Cir. 2023) (quotation marks omitted). Summary judgment is warranted if an agency declaration justifies the nondisclosure with "reasonably specific detail" and is not "substantially called into question by contrary record evidence or evidence of agency bad faith." *Id.* at 929. Ultimately, the Government's justification is sufficient if it "appears logical or plausible, taking into

account the deference due to the Executive Branch in this area." *Knight First Amendment Inst.*, 11 F.4th at 819-20.

## A. CIA Searched for and Produced Officially Acknowledged Records.

"A defining characteristic of the CIA's intelligence activities is that they are carried out through clandestine means, and therefore they must remain secret in order to be effective." JA41-42. Thus, while it is widely known that the agency "is responsible for conducting intelligence collection and analysis for the United States, the CIA generally does not confirm or deny the existence, or disclose the target, of specific intelligence collection activities of the operations it conducts or supports." JA51-52. This Court has repeatedly sustained *Glomar* responses to requests for such specific information under FOIA. *See, e.g.*, *Schaerr*, 69 F.4th at 926 ("records about the unmasking of members of President Trump's campaign and transition team"); *Knight First Amendment Inst.*, 11 F.4th at 813 (records about whether CIA "knew, before the murder, of an impending threat to [Jamal] Khashoggi"); *Leopold v. CIA*, 987 F.3d 163, 168 (D.C. Cir. 2021) ("records about [CIA] 'payments to Syrian rebels fighting [Bashar al-] Assad'").

In this case, however, the agency possessed a small number of "officially acknowledged records" that were responsive to Connell's request. JA46. Because "acknowledging the existence" of these particular records would not "fall within a FOIA exemption," *Schaerr*, 69 F.4th at 928, a *Glomar* response would not be proper as to this category of records. CIA therefore conducted a search reasonably calculated to locate all such records, released two documents with redactions, and withheld a third in full. Connell does not challenge any aspect of the agency's response with respect to these documents.

But apart from these three documents, any other records responsive to Connell's request "would reveal a classified or otherwise unacknowledged connection" between CIA and the "operational control" of detainees at Camp VII during the time period at issue. JA57. The "fact of the existence or nonexistence of such records" is itself "classified and protected by statute," and therefore falls within the scope of Exemptions 1 and 3. JA57. For this category of records, CIA issued a *Glomar* response.

As the district court recognized, this Court has expressly approved the use of the *Glomar* response in such a situation. JA495. In *Wolf*, the

FOIA requester sought CIA records about a former Colombian politician.  473 F.3d at 372.  The Court held that the agency could not invoke *Glomar* with respect to records that had been officially acknowledged through congressional testimony of a former CIA Director.  *Id.* at 479-80.  But it sustained the *Glomar* response with respect to all other responsive records because the agency had demonstrated that "the existence or nonexistence" of those records was protected from disclosure by Exemptions 1 and 3.  *Id.* at 380; *see also Moore v. CIA*, 666 F.3d 1330, 1334 (D.C. Cir. 2011) (describing *Wolf*).

## B. The Existence or Nonexistence of Other Records Relates to Intelligence Sources and Methods and Is Exempt from Disclosure.

**1.**  FOIA Exemption 3 applies to "matters" that are "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  Coverage under this exemption does not depend on "the detailed factual contents of specific documents."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007).  Rather, an agency carries its burden of invoking Exemption 3 by establishing "the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Id.*

Here, CIA invoked the National Security Act of 1947, as amended, which directs the Director of National Intelligence to "protect . . . intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). "By delegation, the Director of the Central Intelligence Agency must do the same." *Leopold*, 987 F.3d at 167; *see also DiBacco v. U.S. Army*, 795 F.3d 178, 196-99 (D.C. Cir. 2015). This statute authorizes CIA to "do more than simply withhold the names of intelligence sources." *CIA v. Sims*, 471 U.S. 159, 178 (1985). "[B]its and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself." *Id.* (quotation marks omitted). "[W]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *Id.* Accordingly, CIA has the power under the National Security Act "to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source" or uncover an intelligence method. *Id.*

Because the National Security Act "qualifies as a withholding statute under Exemption 3," *Sims*, 471 U.S. at 167, the "only remaining

inquiry is whether the withheld material relates to intelligence sources and methods," *Larson v. Department of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). Because intelligence officials are "familiar with 'the whole picture,' as judges are not," their determinations in this regard "are worthy of great deference given the magnitude of the national security interests and potential risks at stake." *Sims*, 417 U.S. at 179.

CIA's declaration explains that "[i]ntelligence methods are the techniques and means by which an intelligence agency accomplishes [its] mission, and the classified internal regulations, approvals, and authorities that govern the conduct of CIA personnel." JA51. Here, Connell asked for "any and all information that relates to" CIA's "operational control" over a particular set of detainees held in a particular location on Guantanamo Bay Naval Station. JA58. He sought documents revealing not only whether CIA exerted such "operational control" over those individuals in that location but also "*details* about the CIA's purported operational control," JA490 (emphasis added), including how broadly it reached, who carried it out (personnel or contractors), when and how it might have ended, which other organizations were involved, and how those other organizations

could access detainees, JA63. As the declaration notes, no matter which way it responded, CIA would be revealing information about its "intelligence interests, personnel, capabilities, authorities, and resources," not to mention its "relationships with other agencies." JA47.

Under any standard of review, there can be no serious doubt that revealing whether CIA has responsive, unacknowledged documents would reveal information that "relates to intelligence sources and methods." *Larson*, 565 F.3d at 865. But here the agency need only establish that its arguments are logical and plausible because the protection of "intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts." *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *see Sims*, 471 U.S. at 174-75.

**2.** The information protected by CIA's *Glomar* response is also independently protected by FOIA Exemption 1. Exemption 1 shields information that is properly classified "under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1)(A). Under Executive Order 13,526, information within the government's control is properly classified by an original classification authority if (1) the information "pertains to . . .

intelligence activities (including covert action), intelligence sources or methods" and (2) "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." Exec. Order No. 13,526 §§ 1.1(a), 1.4(c). The Order further states that an agency "may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified." *Id.* § 3.6(a).

The agency declaration, from a senior official with original classification authority, explains why it is logical and plausible that the existence (or not) of unacknowledged responsive documents is a properly classified fact. First, as explained above, confirming or denying the existence or nonexistence of responsive records would reveal information related to intelligence activities, sources, and methods by providing "insight into the CIA's priorities, resources, capabilities, and relationships with other agencies." JA47; *see also* JA51 (explaining that "intelligence . . . activities" refers to "operations, including the clandestine activities undertaken by the CIA to collect intelligence and the means utilized by the CIA to collect intelligence").

Second, the declaration identifies the potential damage to national security that could reasonably be expected to result from confirming or denying the existence or nonexistence of unacknowledged records. For example, "terrorist organizations, foreign intelligence services, and other hostile groups" gather information regarding the activities of CIA, "analyze this information," and use it "to undermine CIA intelligence activities and attack the United States and its interests." JA46-47. Disclosing information about CIA activities can also "jeopardize the safety of the CIA employees and the employees of other agencies" who might be involved. JA47. Hostile groups "are able to gather information from a myriad of sources" and use "seemingly disparate pieces of information" to accomplish their aims. JA46. "FOIA does not require [CIA] to lighten the task of our adversaries around the world by providing them with documentary assistance from which to piece together the truth." *Gardels*, 689 F.2d at 1105.

This declaration establishes that the *Glomar* response was supported by Exemption 1. *See Morley*, 508 F.3d at 1124 ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified.").

Whether the "existence of records *vel non* is properly classified" is a determination made in the first instance by an original classification authority, and that determination is given "substantial weight" by a reviewing court. *Wolf*, 473 F.3d at 375-76. This Court has credited similar concerns in other cases where agencies have declined to confirm or deny the existence or nonexistence of intelligence records. *See, e.g.*, *Knight First Amendment Inst.*, 11 F.4th at 820 (noting agency assertions that disclosing areas of intelligence interest "would be useful information for foreign adversaries"); *Wolf*, 473 F.3d at 376-77 (finding it "plausible that either confirming or denying an Agency interest in a foreign national reasonably could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures").

## C. The Information Protected by CIA's *Glomar* Response Has Not Been Officially Acknowledged.

Under this Court's case law, the disclosure of information "may be compelled even over an agency's otherwise valid exemption claim" if the information has been "officially acknowledged." *Wolf*, 473 F.3d at 378. The theory behind this doctrine is that "[i]f an agency has officially acknowledged otherwise exempt information through prior disclosure, it

has waived its right to claim an exemption with respect to that information." *Knight First Amendment Inst.*, 11 F.4th at 813 (quotation marks omitted). Waiver by "official acknowledgment" is analyzed under a three-part test: the protected material (i) "must be as specific as the information previously released"; (ii) "must match the information previously disclosed"; and (iii) "must already have been made public through an official and documented disclosure." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).

This specific-match test is "strict." *Moore*, 666 F.3d at 1330. It is, by design, "a high hurdle for a FOIA plaintiff to clear." *Public Citizen v. Department of State*, 11 F.3d 198, 203 (D.C. Cir. 1993). "[A] plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Department of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). "Prior disclosure of similar information does not suffice . . . ." *Wolf*, 473 F.3d at 378. Rather, "the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Id*. The test "insist[s] on exactitude" in

order to protect "the Government's vital interest in information relating to national security and foreign affairs." *Id.*

An agency's *Glomar* response "narrows the FOIA issue to the existence of records *vel non.*" *Wolf*, 473 F.3d at 374 n.4; *see Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976) ("In effect, the situation is as if appellant had requested and been refused permission to see a document which says either 'Yes, we have records related to contacts with the media concerning the Glomar Explorer' or 'No, we do not have any such records.'"). Thus, "[t]o constitute official acknowledgment in the *Glomar* context, the prior disclosure must confirm the existence or nonexistence of records responsive to the FOIA request." *Knight First Amendment Inst.*, 11 F.4th at 813.

The third element of the tripartite test is similarly strict. A disclosure is official only if it is made by "the agency from which the information is being sought" or "an authorized representative of the agency's parent." *Knight First Amendment Inst.*, 11 F.4th at 816. The Court has applied the "general rule" that "[d]isclosure by one federal agency does not waive another agency's right to assert a FOIA exemption" in a variety of cases and contexts. *Id.* (alteration in

original).  For example, the Federal Bureau of Investigation (FBI) cannot make an official acknowledgment on behalf of CIA.  *Moore*, 666 F.3d at 1333 n.4.  Neither can the Office of Personnel Management.  *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999).  This Court has also "rejected attempts to establish an agency's official acknowledgement based on disclosures by Congress, the media, the agency's former employees, and foreign governments."  *Knight First Amendment Inst.*, 11 F.4th at 816 (citations omitted).

Connell points to two categories of documents that he claims are official acknowledgments of the information protected by CIA's *Glomar* response here.  First, he relies on the documents that CIA produced in response to his FOIA request: a memorandum of agreement between CIA and DoD "concerning the detention by DoD of certain terrorists at a facility as Guantanamo Bay Naval Station," JA307, and a proposed itinerary for a visit by the former CIA Director to Guantanamo with an accompanying memorandum about the facility, JA316.  Connell argues (Br. 52) that, because these documents "include information about the measure or extent of CIA operational control over the detainees at Camp VII," they necessarily "waive the agency's Glomar response."

This argument misunderstands the scope of CIA's *Glomar* response in this case. The agency did not refuse to confirm or deny the existence of *any records* responsive to Connell's request. Rather, it asserted a *Glomar* response with respect to "records that would reveal a *classified or otherwise unacknowledged* connection" between CIA and "operational control" over detainees held at Camp VII during a specified period of time. JA57 (emphasis added). Connell does not point to anything in the documents that CIA produced to him that acknowledges the existence or nonexistence of such records. Thus, those records do not officially acknowledge the specific information at issue.

To the extent that Connell suggests that the agency's acknowledgment of some documents prevents it from invoking *Glomar* with respect to others, that contention is squarely foreclosed by this Court's decision in *Wolf*. As in that case, "[t]he CIA's official acknowledgment waiver relates only to the existence or nonexistence of the records" that have been officially "disclosed by" the agency. *Wolf*, 473 F.3d at 379. Connell "is entitled to disclosure of that information, namely the existence of CIA records . . . that have been previously disclosed (but not any others)." *Id.*

Second, Connell invites (Br. 54) the Court to "consider relying on the public disclosures found in the [Senate Committee] Report to conclude that the CIA has waived its ability to assert a Glomar response." This attempt to establish official acknowledgment is also foreclosed by precedent. On more than one occasion, this Court has "rejected attempts to establish an agency's official acknowledgment based on disclosures by Congress." *Knight First Amendment Inst.*, 11 F.4th at 816 (citing *Fitzgibbon*, 911 F.2d at 766; *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982)).

Connell tries to avoid this conclusion by citing to opinions declaring that statements made by federal contractors in a deposition or by the government's lawyers in federal court would—in contexts other than FOIA—be "tantamount" to official acknowledgments by their principals. Br. 55 (quoting *United States. v. Zubaydah*, 595 U.S. 195, 211 (2022); *Ameziane v. Obama*, 699 F.3d 488, 493 (D.C. Cir. 2012)). But Congress is not an agent of CIA; it is an entirely separate branch of government.

Nor would it matter if there were "good reason" (Br. 56) to credit the Senate Committee's characterization of CIA's role at Camp VII.

This court has consistently held that "a disclosure made by someone other than the agency from which the information is being sought" is not "official." *Knight First Amendment Inst.*, 11 F.4th at 816 (quoting *Frugone*, 169 F.3d at 774). If this rule could be overcome by a showing that the third party is credible, *Frugone* would have come out the other way. There is good reason to think that Office of Personnel Management could credibly identify the personnel of the Executive Branch. But this Court held that a statement from that office that a person's employment records were held by CIA did not count as an official acknowledgment of the employment relationship. *Frugone*, 169 F.3d at 774.

Even if, contrary to decades of this Court's precedent, the Senate Committee report could be attributed to CIA, Connell fails to identify (Br. 54-57) any portion of the report he claims is an exact match to the information protected by *Glomar* (the existence of documents revealing a previously unacknowledged connection to CIA "operational control" over certain detainees at a particular location in a specific time frame). He points (Br. 35) to a part of the report that cites a CIA document to support the Committee's characterization of the agency's relationship to

Camp VII as one of "operational control," JA114, but that document has been acknowledged and provided to Connell. He also points (Br. 38) to a part of the report that discusses CIA activities at Guantanamo "prior to the time period in question." Connell believes (Br. 38) that the document cited at that portion of the report—the DoD-CIA memorandum of agreement—"suggests some kind of ongoing CIA role" at the facility, but that document has also been acknowledged and provided to him. Finally, Connell points (Br. 38) to the report's citation of "a site daily report and cable" regarding the government's treatment of a particular detainee "after his arrival at Camp VII." But as the district court observed, this passage of the report "says nothing about CIA 'operational control,'" JA493, so it also does not match his request.

This court's decision in *Moore* demonstrates just how exacting the official acknowledgment inquiry is. In that case, a FOIA requester asked CIA and FBI for "all information or records" relating to Svienn B. Valfells, an Icelandic national. *Moore*, 666 F.3d at 1331. CIA issued a *Glomar* response based on Exemptions 1 and 3. FBI produced a redacted report entitled "Svienn B. Valfells." *Id.* The report suggested, and a CIA declarant confirmed, that the FBI report contained "CIA-

originated information" that had been redacted "to protect intelligence sources and methods." *Id.* at 1332. This Court held that neither agency's disclosure precluded a *Glomar* response because CIA did not "identify specific records or dispatches matching [the] FOIA request" and FBI could not officially acknowledge anything on behalf of CIA. *Id.* at 1333 n.4, 1334. No matter how suggestive the facts might have been, the FOIA requester could "only speculate as to what (if any) records the CIA might have about Valfells." *Id.* at 1334. And when "issues of national security" are involved, "[a]n agency's official acknowledgment . . . cannot be based on . . . speculation." *Id.* (alterations in original) (quoting *Wolf*, 473 F.3d at 378).

### D. Various Government Records That Are Not Official Acknowledgments Do Not Foreclose CIA's *Glomar* Response.

Connell's primary argument on appeal is that, even if the existence or nonexistence of the records he seeks has not been officially acknowledged, various record evidence—consisting primarily of documents created by other government entities—makes CIA's *Glomar* response neither logical nor plausible. In making this argument, Connell does not dispute that the agency's declaration justifies the

*Glomar* response with "reasonable specificity of detail." *Electronic Privacy Info. Ctr. v. National Sec. Agency*, 678 F.3d 926, 931 (D.C. Cir. 2012). Nor does he point to anything specific that "contradict[s]" any specific assertion in the declaration or provides "evidence of agency bad faith." *Id.* Rather, he claims that the records of other agencies "leav[e] no doubt that the CIA maintained some measure of operational control over detainees at Camp VII during the relevant time period." Br. 19; *see also* Br. 35.

**1.** As an initial matter, this "argument misunderstands the nature of a *Glomar* response, which narrows the FOIA issue to the existence of records *vel non*." *Wolf*, 473 F.3d at 374 n.4. The relevant question is therefore whether CIA has justified its refusal to confirm or deny the existence of a category of records relevant to Connell's request. Connell mistakenly relies on *American Civil Liberties Union v. CIA*, 710 F.3d 422 (D.C. Cir. 2013), where this Court held that CIA could not invoke *Glomar* to avoid revealing "whether it has an interest in drone strikes" after official acknowledgments from the President, his counterterrorism advisor, and CIA director had made "clear that the Agency does have an interest in drone strikes." *Id.* at 430-31. In other

words, the Court held that the agency had officially acknowledged the underlying information that the *Glomar* response was intended to protect. But here there has been no similar official acknowledgment of the underlying intelligence sources and methods information identified in CIA's declaration—whether or not there is a classified or otherwise unacknowledged relationship between CIA and the detention of certain individuals at Camp VII during the five months at issue. *See* JA46-50. Because confirming or denying the existence or nonexistence of documents reflecting such a relationship would reveal classified and statutorily protected information, the *Glomar* response here remains proper.

More fundamentally, however, Connell's argument is inconsistent with the strict limits this Court has imposed on the official acknowledgment doctrine. He invokes a report by a Senate Committee (Br. 35-39), documents released by CIA and the Office of the Director of National Intelligence (Br. 39-42) in response to FOIA requests (including this one), and various materials related to military commission proceedings conducted by DoD (Br. 42-49) to argue that it is no longer "a secret whether the CIA has records" that are responsive to

his request.[2]  In other words, Connell contends that "the information withheld by the CIA is 'so widely disseminated'" that its disclosure can no longer "cause harm cognizable under a FOIA exemption." *American Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011).  But this Court has already held that such an argument "is foreclosed by [the] requirement . . . that information be 'officially acknowledged'" before an otherwise valid assertion of an exemption is overcome by prior disclosures.  *Id.*

Nor does Connell even attempt to reconcile his approach with any of this Court's cases that have insisted on an exact match of speaker and content before other disclosures will defeat an agency's invocation of Exemptions 1 and 3.  For example, in *Frugone*, the Office of

---

[2] One of these documents, a military commission opinion, did not exist when the district court issued its judgment in this case.  Br. 48-49 (discussing JA498-547).  "In FOIA cases particularly, court review properly focuses on the time the determination to withhold is made," not at the time that the case comes before an appellate court.  *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991).  "To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing."  *Id.*  Moreover, a document created after the district court's judgment by government entity that is not a party to litigation is not part of "the record before the district court" (Br. 32) and therefore is not part of the appendix on appeal.  *See* Fed. R. App. P. 30(a)(1).

Personnel Management did not "trea[t] the 'existence or nonexistence' of records related to [Eduardo Frugone's claimed employment with CIA] to be a secret." Br. 49. Rather, that office informed Frugone that "because his records were in the custody of the CIA, his inquiries should be directed there." 169 F.3d at 773. CIA then responded to those inquiries with a *Glomar* response, refusing to confirm or deny Frugone's employment. "To be sure, the plaintiff in [*Frugone*] did not present the exact theory pressed here" by Connell. *Knight First Amendment Inst.*, 11 F.4th at 817. But the Court in *Frugone* sustained the agency's *Glomar* response, and "the same issue presented in a later case in the same court should lead to the same result." *Id.* at 817-18.

Connell instead invokes a decision of the Second Circuit in *Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016). In that case, CIA issued a *Glomar* response to a request seeking documents relating to a particular person, on the ground that confirming the existence or non-existence of responsive records would tend to disclose whether the agency had an interest in the person as an intelligence asset. *Id.* at 184. After CIA provided its response, FBI released documents that "appear to suggest that multiple government departments and agencies were

41

investigating, monitoring, and had an intelligence interest in" the subject of the request. *Id.* at 185. Starting from the premise that a *Glomar* response is "justified only in unusual circumstances, and only by a particularly persuasive affidavit," the Second Circuit held that, "a third party agency's disclosures" could provide "relevant and contradictory record evidence" that "bear[s] upon whether the CIA is able to carry its burden" of establishing that the *Glomar* response protects a fact exempt from disclosure. *Id.* at 182, 185-87 (quotation marks omitted).

*Florez* is inconsistent with the law of this Circuit. To start, this Court has repeatedly held that *Glomar* responses are subject to the same "general exemption review standards established in non-*Glomar* cases." *Knight First Amend. Inst.*, 11 F.4th at 819 (quoting *American Civil Liberties Union*, 710 F.3d at 426 (quoting *Wolf*, 473 F.3d at 374)); *see also id.* (describing a legal analysis based in part on *Florez* as "flawed"). This Court has also, as noted above, held that reliance on third-party agency disclosures to defeat a *Glomar* response is "foreclosed" by this Court's official acknowledgment cases. *American Civil Liberties Union*, 628 F.3d at 625. Indeed, in one of the cases about

records related to the Glomar Explorer, this court explained that a FOIA requester "show[s] neither 'contrary evidence' nor 'bad faith'" sufficient to undermine and agency declaration by relying on disclosures that fall short of official acknowledgments. *Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C. Cir. 1981); *see also Salisbury*, 690 F.2d at 971 (holding that evidence of various disclosures that were not official acknowledgments "is not contradictory and does not undermine the agency's affidavits").

2. Regardless, it is logical and plausible for CIA to assert a *Glomar* response here even if Connell's interpretation of the Senate and DoD records were correct. Particularly "in the arena of intelligence and foreign relations there can be a critical difference between official and unofficial disclosures." *Fitzgibbon*, 911 F.2d at 765. A statement made by an intelligence agency regarding its own sources, methods, and activities "is given unique meaning and weight." *Knight First Amendment Inst.*, 11 F.4th at 816. "While information from outside an agency may be viewed as 'possibly erroneous,' confirmation by the agency itself 'would remove any lingering doubts.'" *Id.* (quoting *Frugone*, 169 F.3d at 774-75). It this therefore "hardly illogical or

implausible" for an intelligence agency to issue a *Glomar* response even if another government entity has disclosed related information. *Id.* at 821.[3] "[T]he fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption." *Wolf*, 473 F.3d at 378. A court "cannot assume," as Connell does, "that the CIA has nothing left to hide." *Military Audit Project*, 656 F.2d at 745.

The error of Connell's position is especially clear when considered in the context of Exemption 3. The availability of that exemption does not depend "on the detailed factual contents of specific documents," *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978), and it does not require a showing of harm, *see Hayden v. National Sec. Agency*, 608 F.2d 1381, 1390 (D.C. Cir. 1979) ("Congress has already, in enacting the statute, decided that disclosure . . . is potentially harmful."). Here, CIA

---

[3] The Court described the third-party disclosure at issue in *Knight First Amendment Institute* as coming from "an agency outside the intelligence community." 11 F.4th at 821. But this fact does not matter. Earlier in the very same opinion, the Court noted that a component of the State Department "is a member of the intelligence community" and held that disclosures by one member of that community "do not foreclose" others "from asserting their *Glomar* responses." *Id.* at 817-18; *see also Moore*, 666 F.3d at 1333 n.4.

must demonstrate only that it is logical or plausible that the information sought to be disclosed falls within the scope of the National Security Act, and a court's deference is "even greater" than under Exemption 1 given the express delegation of authority to protect intelligence sources and methods. *Wolf*, 473 F.3d at 377; *see also Sims*, 471 U.S. at 168-69.

Connell offers no argument at all that any of the sources he relies on makes it less logical or plausible that the information protected by CIA's *Glomar* response is not related to intelligence sources or methods. He simply believes (*see, e.g.*, Br. 49) that such information should no longer be considered secret. But making that determination "is the responsibility of the Director of Central Intelligence, not that of the judiciary." *Sims*, 471 U.S. at 180.

Nor do Connell's various documents undermine the applicability of Exemption 1. He does not identify which specific requirement for classification he thinks is made less logical or plausible by the third-party disclosures. *See* JA 44-45 (discussing the requirements of Executive Order 13,526). He does not claim that the documents suggest that the agency's declarant is not an original classification authority or

that the information protected by the *Glomar* response is not owned or under the control of the United States. Exec. Order No. 13,526 § 1.1(a)(1), (2). Nor does he claim that the documents suggest that the information does not pertain to "intelligence activities" or "intelligence sources and methods." *Id.* §§ 1.1(a)(3), 1.4(c). Connell appears to believe that, because various government records (as he construes them) might suggest that "CIA had at least some measure of operational control over Camp VII," Br. 35 (emphasis omitted), requiring the CIA to disclose whether or not it has unacknowledged documents on the subject would not be likely to cause damage to the national security. But a senior CIA official with classification authority has reached a contrary conclusion, and courts do not "micromanage agency determinations that such information should remain secret" because "national security is primarily the province of the Executive." *Schaerr*, 69 F.4th at 929.

Further, this Court has "repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject." *American Civil Liberties Union*, 628 F.3d at 625; *see also*

*Salisbury*, 690 F.2d at 971 ("The fact of disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case.").  As the Supreme Court has explained, "[t]he national interest sometimes makes it advisable, or even imperative, to disclose" national security information, including "information that may lead to the identity of intelligence sources." *Sims*, 471 U.S. at 180.  For example, the "Government may choose to release information deliberately to 'send a message' to allies or adversaries."  *Id.*  The executive order governing classification likewise recognizes that "the need to protect such information may be outweighed by the public interest in disclosure."  Exec Order No. 13,526, § 3.1(d).

But it is "the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process."  *Sims*, 471 U.S. at 180.  Thus, for any potential disclosure of classified or statutorily protected information, it is up to the agency responsible for the information to "determine, as an exercise of

discretion, whether the public interest in disclosure outweighs the damage to the national security that might reasonably be expected from disclosure." Exec. Order No. 13,526, § 3.1(d); *see also Sims*, 471 U.S. at 180 ("Congress did not mandate the withholding of information that may reveal the identity of an intelligence source; it made the Director of Central Intelligence responsible only for protecting against unauthorized disclosures." (emphasis omitted)). This Court should therefore firmly reject Connell's request to leverage previous, limited disclosures to compel the disclosure of additional information—over the considered objection of Executive Branch officials vested with the authority to make such determination—on the basis that it might relate to the same general topic.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

SHARON SWINGLE

*/s/ Thomas Pulham*
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*
*thomas.pulham@usdoj.gov*

January 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,230 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Thomas Pulham*
Thomas Pulham

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Thomas Pulham*
Thomas Pulham

# ADDENDUM

## TABLE OF CONTENTS

5 U.S.C. § 552 (excerpts) .......................................................... A1

50 U.S.C. § 3024(i) ................................................................. A4

**5 U.S.C. § 552 (excerpts)**

**§ 552. Public information; agency rules, opinions, orders, records, and proceedings**

**(a)** Each agency shall make available to the public information as follows:

. . .

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

. . .

(4)(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

. . .

**(b)** This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense

A1

or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

   (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

   (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

   (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national

security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

. . . .

**50 U.S.C. § 3024(i)**

**§ 3024. Responsibilities and authorities of the Director of National Intelligence**

. . .

**(i) Protection of intelligence sources and methods**

(1) The Director of National Intelligence shall protect, and shall establish and enforce policies to protect, intelligence sources and methods from unauthorized disclosure.

(2) Consistent with paragraph (1), in order to maximize the dissemination of intelligence, the Director of National Intelligence shall establish and implement guidelines for the intelligence community for the following purposes:

    (A) Classification of information under applicable law, Executive orders, or other Presidential directives.

    (B) Access to and dissemination of intelligence, both in final form and in the form when initially gathered.

    (C) Preparation of intelligence products in such a way that source information is removed to allow for dissemination at the lowest level of classification possible or in unclassified form to the extent practicable.

(3) The Director may only delegate a duty or authority given the Director under this subsection to the Principal Deputy Director of National Intelligence.

. . . .