APPEAL,CLOSED,JURY,PROSE–NP,TYPE I–FOIA

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:21–cv–00627–CRC</u>
### *Internal Use Only*

| | |
|---|---|
| CONNELL v. UNITED STATES CENTRAL INTELLIGENCE AGENCY | Date Filed: 03/08/2021 |
| | Date Terminated: 03/29/2023 |
| Assigned to: Judge Christopher R. Cooper | Jury Demand: None |
| Cause: 05:552 Freedom of Information Act | Nature of Suit: 895 Freedom of Information Act |
| | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **JAMES G. CONNELL, III** | represented by | **JAMES G. CONNELL, III** |
| | | 7604 Edenwood Ct. |
| | | Bethesda, MD 20817 |
| | | 703–623–8410 |
| | | PRO SE |
| | | |
| | | **Brett Max Kaufman** |
| | | AMERICAN CIVIL LIBERTIES UNION FOUNDATION |
| | | 125 Broad Street |
| | | 18th Floor |
| | | New York, NY 10004 |
| | | (212) 549–2603 |
| | | Fax: (212) 549–2654 |
| | | Email: bkaufman@aclu.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **James G. Connell , III** |
| | | CONNELL LAW |
| | | PO Box 141 |
| | | Cabin John, MD 20818 |
| | | (703) 623–8410 |
| | | Email: jconnell@connell–law.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**<u>Defendant</u>**

| | | |
|---|---|---|
| **UNITED STATES CENTRAL INTELLIGENCE AGENCY** | represented by | **April Denise Seabrook** |
| | | U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA |
| | | 555 Fourth Street, NW |
| | | Washington, DC 20530 |

(202) 252–2525
Fax: (202) 252–2599
Email: april.seabrook@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Anthony Quinn**
DOJ–USAO
Civil Division
555 4th Street, NW
Washington, DC 20530
(202) 252–7558
Fax: (202) 252–2599
Email: tony.quinn2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/08/2021 | 1 | COMPLAINT against UNITED STATES CENTRAL INTELLIGENCE AGENCY filed by JAMES G. CONNELL, III. (Attachments: # 1 Civil Cover Sheet)(ztd) (Entered: 03/11/2021) |
| 03/08/2021 | | SUMMONS Not Issued as to JAMES G. CONNELL, III, U.S. Attorney and Attorney General (ztd) (Entered: 03/11/2021) |
| 03/10/2021 | | Filing fee received: $ 402.00, receipt number: 4616105214. (ztd) (Entered: 03/11/2021) |
| 03/29/2021 | | SUMMONS (3) Issued as to UNITED STATES CENTRAL INTELLIGENCE AGENCY, U.S. Attorney and U.S. Attorney General (ztd) (Entered: 03/29/2021) |
| 04/15/2021 | 2 | CERTIFICATE OF SERVICE by JAMES G. CONNELL, III . (Connell, James) (Entered: 04/15/2021) |
| 04/15/2021 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/15/2021. ( Answer due for ALL FEDERAL DEFENDANTS by 5/15/2021.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES CENTRAL INTELLIGENCE AGENCY served on 4/7/2021, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/8/2021. (See Docket Entry 2 to view document). (znmw) (Entered: 04/28/2021) |
| 05/05/2021 | 4 | NOTICE of Appearance by April Denise Seabrook on behalf of UNITED STATES CENTRAL INTELLIGENCE AGENCY (Seabrook, April) (Entered: 05/05/2021) |
| 05/17/2021 | 5 | ANSWER to 1 Complaint by UNITED STATES CENTRAL INTELLIGENCE AGENCY.(Seabrook, April) (Entered: 05/17/2021) |
| 05/18/2021 | | MINUTE ORDER: Before the Court in this FOIA case are a complaint and an answer. It is hereby ordered that the parties shall promptly confer and shall file a joint proposed schedule for briefing or disclosure by 6/1/2021. Signed by Judge Christopher R. Cooper on 5/18/2021. (lccrc2) (Entered: 05/18/2021) |
| 05/18/2021 | | Set/Reset Deadlines: Joint Proposed Briefing Schedule due by 6/1/2021 (lsj) (Entered: 05/18/2021) |

| 06/01/2021 | 6 | Joint STATUS REPORT *with Proposed Schedule* by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Seabrook, April) (Entered: 06/01/2021) |
|---|---|---|
| 06/04/2021 | | MINUTE ORDER: In light of 6 the parties' latest Joint Status Report, the following schedule shall apply: Defendant shall issue its final response to the FOIA request, including either (i) refusing to confirm or deny the existence of additional responsive records and/or (ii) making additional disclosures by 07/15/2021; Plaintiff shall identify which withholdings, if any, that he requires more information about and/or is challenging by 07/29/2021; Defendant shall produce a Vaughn index to Plaintiff by 09/01/2021; the parties shall file a Joint Status Report proposing a schedule for further proceedings, if necessary, by 9/15/2021. Signed by Judge Christopher R. Cooper on 6/4/2021. (lccrc2) (Entered: 06/04/2021) |
| 07/29/2021 | 7 | STATUS REPORT *Plaintiff's Position on Disclosures* by JAMES G. CONNELL, III. (Connell, James) (Entered: 07/29/2021) |
| 08/08/2021 | 8 | NOTICE of Appearance by Thomas Anthony Quinn on behalf of UNITED STATES CENTRAL INTELLIGENCE AGENCY (Quinn, Thomas) (Entered: 08/08/2021) |
| 09/15/2021 | 9 | Joint STATUS REPORT by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 09/15/2021) |
| 09/15/2021 | | MINUTE ORDER: In light of 9 the parties' latest Joint Status Report, the parties are directed to file a further Joint Status Report on or before December 15, 2021. Signed by Judge Christopher R. Cooper on 09/15/2021. (lccrc2) (Entered: 09/15/2021) |
| 12/15/2021 | 10 | Joint STATUS REPORT by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 12/15/2021) |
| 12/16/2021 | | MINUTE ORDER: In light of 10 the parties' latest Joint Status Report, the parties are directed to file a further Joint Status Report on or before January 17, 2022. Signed by Judge Christopher R. Cooper on 12/16/2021. (lccrc2) (Entered: 12/16/2021) |
| 01/18/2022 | 11 | Joint STATUS REPORT by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 01/18/2022) |
| 01/19/2022 | | MINUTE ORDER: In light of 11 the parties' latest Joint Status Report, the following briefing schedule shall apply: Defendant's motion for summary judgment is due by 3/14/2022; Plaintiff's combined cross–motion for summary judgment and opposition to Defendant's motion is due by 4/14/2022; Defendant's combined reply in support of its motion and opposition to Plaintiff's cross–motion is due by 5/5/2022; Plaintiff's reply is due by 5/19/2022. Signed by Judge Christopher R. Cooper on 1/19/2022. (lccrc2) (Entered: 01/19/2022) |
| 03/11/2022 | 12 | MOTION for Extension of Time to File *DEFENDANT's MOTION FOR SUMMARY JUDGMENT AND AND TO MODIFY REMAINDER OF BRIEFING SCHEDULE* by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Text of Proposed Order)(Quinn, Thomas) (Entered: 03/11/2022) |
| 03/15/2022 | | MINUTE ORDER granting 12 Defendant's Motion for Extension of Time and Modification of the Briefing Schedule. The following deadlines shall apply: Defendant's motion for summary judgment is due by 3/28/2022. Plaintiff's combined cross–motion for summary judgment and opposition to Defendant's motion is due by 4/28/2022; Defendant's combined reply in support of its motion and opposition to Plaintiff's cross–motion is due by 5/19/2022; Plaintiff's reply is due by 6/2/2022. Signed by Judge Christopher R. Cooper on 3/15/2022. (lccrc2) (Entered: 03/15/2022) |

| 03/29/2022 | 13 | MOTION for Summary Judgment by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Quinn, Thomas) (Entered: 03/29/2022) |
|---|---|---|
| 03/29/2022 | 14 | DECLARATION *IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND EXHIBITS AND VAUGHN INDEX* by UNITED STATES CENTRAL INTELLIGENCE AGENCY re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Quinn, Thomas) (Entered: 03/29/2022) |
| 03/29/2022 | 15 | Order advising plaintiff to respond to 13 Motion for Summary Judgment by April 28, 2022, or Court may deem matter as conceded. Signed by Judge Christopher R. Cooper on 3/29/2022. (lccrc2) (Entered: 03/29/2022) |
| 04/28/2022 | 16 | DECLARATION *of Amy Zittritsch in Support of Opposition* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 17 | DECLARATION *of Alka Pradhan in Support of Opposition* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 18 | DECLARATION *of Steven Aftergood* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 19 | DECLARATION *of Vanessa Brinkman* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 20 | DECLARATION *of Neal Higgins* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 21 | DECLARATION *of Martha Lutz* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 22 | DECLARATION *of James G. Connell, III in Support of Opposition* by JAMES G. CONNELL, III re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Connell, James) (Entered: 04/28/2022) |
| 04/28/2022 | 23 | Memorandum in opposition to re 13 MOTION for Summary Judgment filed by JAMES G. CONNELL, III. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Connell, James) (Entered: 04/28/2022) |
| 05/13/2022 | 24 | Unopposed MOTION for Leave to File *STATEMENT OF MATERIAL FACTS NUNC PRO TUNC AND TO MODIFY BRIEFING SCHEDULE* by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Exhibit)(Quinn, Thomas). Added MOTION to Modify on 5/16/2022 (znmw). (Entered: 05/13/2022) |

| 05/17/2022 | | MINUTE ORDER granting 24 Motion for Leave to File Statement of Material Facts *Nunc Pro Tunc* and Modify the Briefing Schedule. The [24−1] Defendant's Statement of Undisputed Material Facts is hereby made part of the record. The following deadlines shall apply: Plaintiff shall file any supplemental opposition brief by May 27, 2022; Defendant shall file its combined reply and opposition by June 10, 2022; Plaintiff shall file any reply by June 24, 2022. So Ordered by Judge Christopher R. Cooper on 5/17/2022. (lccrc2) (Entered: 05/17/2022) |
| --- | --- | --- |
| 05/17/2022 | 25 | STATEMENT of Material Facts re 23 Memorandum in Opposition filed by JAMES G. CONNELL, III by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (znmw) (Entered: 05/18/2022) |
| 05/25/2022 | 26 | SUPPLEMENTAL MEMORANDUM to re 25 Memorandum *in Opposition to Statement of Facts* filed by JAMES G. CONNELL, III. (Connell, James) (Entered: 05/25/2022) |
| 06/10/2022 | 27 | REPLY to opposition to motion re 13 MOTION for Summary Judgment filed by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 06/10/2022) |
| 06/10/2022 | 28 | MOTION to Modify *BRIEFING SCHEDULE BY TRUNCATING LAST DEADLINE* by UNITED STATES CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 06/10/2022) |
| 06/13/2022 | | MINUTE ORDER granting 28 Defendant's Motion to Modify the Briefing Schedule. In light of the Plaintiff's decision not to file a cross−motion for summary judgment, the June 24, 2022, deadline for Plaintiff's reply is hereby stricken. Signed by Judge Christopher R. Cooper on 6/13/2022. (lccrc2) (Entered: 06/13/2022) |
| 03/29/2023 | 29 | ORDER granting 13 Defendant's Motion for Summary Judgment. See full Order and accompanying Memorandum Opinion for details. Signed by Judge Christopher R. Cooper on 03/29/2023. (lccrc3) (Entered: 03/29/2023) |
| 03/29/2023 | 30 | MEMORANDUM OPINION re 29 ORDER granting 13 Defendant's Motion for Summary Judgment. Signed by Judge Christopher R. Cooper on 03/29/2023. (lccrc3) (Entered: 03/29/2023) |
| 05/25/2023 | 31 | NOTICE of Appearance by Brett Max Kaufman on behalf of JAMES G. CONNELL, III (Kaufman, Brett) (Entered: 05/25/2023) |
| 05/25/2023 | 32 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 30 Memorandum & Opinion, 29 Order on Motion for Summary Judgment by JAMES G. CONNELL, III. Filing fee $ 505, receipt number ADCDC−10096466. Fee Status: Fee Paid. Parties have been notified. (Kaufman, Brett) (Entered: 05/25/2023) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES G. CONNELL, III,

             Plaintiff,

       v.

CENTRAL INTELLIGENCE AGENCY,

           Defendant.

Civil Action No. 1:21-cv-00627-CRC

### <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Plaintiff, James G. Connell, III, hereby appeals to the

United States Court of Appeals for the District of Columbia Circuit from this Court's March 29,

2023 Order and Judgment, ECF No. 29, and Memorandum Opinion, ECF No. 30.

Dated: May 25, 2023           Respectfully Submitted,

                         */s/ Brett M. Kaufman*
                         Brett M. Kaufman (D.C. Bar No. NY0224)
                         American Civil Liberties UnionFoundation
                         125 Broad Street, 18th Floor
                         New York, NY 10004
                         (212) 549-2603
                         bkaufman@aclu.org

                         *Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JAMES G. CONNELL, III**, | |
| Plaintiff, | |
| v. | Case No. 21-cv-627 (CRC) |
| **UNITED STATES CENTRAL INTELLIGENCE AGENCY**, | |
| Defendant. | |

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [13] Defendant's Motion for Summary Judgment is **GRANTED**.

This is a final appealable Order.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>March 29, 2023</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **JAMES G. CONNELL, III**, |
| Plaintiff, |
| v. |
| **UNITED STATES CENTRAL INTELLIGENCE AGENCY**, |
| Defendant. |

Case No. 21-cv-627 (CRC)

**MEMORANDUM OPINION**

In 2006, the Central Intelligence Agency transferred a number of "high-value" detainees to a detention facility at the U.S. military base in Guantanamo Bay, Cuba known as Camp 7. The intelligence community later declassified snippets of information that touch on the CIA's relationship to that facility. In 2014, for instance, the Director of National Intelligence blessed the public release of a redacted executive summary to a study by the Senate Select Committee on Intelligence ("SSCI") on the CIA's detention and interrogation program in the aftermath of the September 11, 2001 terrorist attacks. The executive summary states that in September 2006, after "14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA." Decl. of Amy Zittritsch ("Zittritsch Decl.") Ex. B at 160. Seizing on this statement, defense lawyer James Connell, who represents Guantanamo detainee Ammar al Baluchi before a U.S. military commission, filed a FOIA request with the CIA seeking "any and all information" relating to the CIA's "operational control . . . over Guantanamo Bay detainees." Decl. of Vanna Blaine, Information Review Officer ("Blaine Decl.") Ex. 1 at 1. After receiving clarification of the request, the agency responded by providing Connell three documents and

withholding one other.  As to other records, the agency issued a "*Glomar*"[1] response, neither

confirming nor denying that any responsive information exists.  The agency based its *Glomar*

response on FOIA Exemptions 1 and 3, which protect from release, respectively, classified

records and records prohibited from disclosure by statute.

     Connell challenges the CIA's *Glomar* response.  Specifically, he contends the agency

waived its ability to assert the response because it has purportedly declassified and publicly

acknowledged the existence of information reflecting its "operational control" over Camp 7,

including in the two documents the CIA released to him.  Rejecting Connell's waiver argument,

the Court will grant summary judgment for the CIA.

## I.    Background

     Mr. Connell lodged the request at issue with the CIA in May 2017.  Blaine Decl. Ex. 1 at

1.  The request begins:

> **Description of Request:**  In the Report: "Senate Select Committee on
> Intelligence: Committee Study of the Central Intelligence Agency's Detention and
> Interrogation Program" reads [sic] on page 160:
>
> > "After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay,
> > they were housed in a separate building from other U.S. military detainees and remained
> > under the operational control of the CIA."  [Footnote 977 – CIA Background Memo for
> > CIA Director Visit to Guantanamo, December [redacted], 2006, entitled Guantanamo
> > Bay High-Value Detainee Detention Facility].  (brackets in original) (emphasis omitted).

It continues:

> > I request for [sic] any and all information that relates to such "operational control"
> > of the CIA over Guantanamo Bay detainees including but not limited to the document
> > cited in the footnote 977.

Id.

---

[1]  The *Glomar* response got its name from the Glomar Explorer vessel—the focus of
<u>Phillippi v. CIA</u>, where a FOIA requester challenged the CIA's refusal to acknowledge the
existence of records about the ship.  546 F.2d 1009 (D.C. Cir. 1976).

After acknowledging receipt, the CIA's FOIA office wrote to Connell seeking clarification regarding the scope of the request.  Blaine Decl. Exs. 2, 3.  It asked Connell to "provide the aspects of operational control that interest you, as well as a specific [] period of time you would like us to search."  Id. Ex. 3 at 1.  Connell responded that "[t]he specific period of time in which I am interested is 1 September 2006 to 31 January 2007."  Id. Ex. 4 at 1.  He further explained that "I am seeking to determine what 'operational control' means," and offered the following unexhaustive list of "possible topics:"

(1) Whether CIA "operational control" included only Camp 7 or extended to other facilities such as Echo 2;

(2) What organization had decision-making authority over Camp 7;

(3) Whether CIA "operational control" ended before or after 31 January 2007;

(4) Whether the "operational control" involved CIA personnel, whether employees or contractors;

(5) Any detainee records maintained by the CIA during the period of "operational control," such as Detainee Inmate Management System records or the equivalent;

(6) How other agencies would obtain access to detainees during the period of "operational control,["] such as a Memorandum of Understanding with the Federal Bureau of Investigation or Criminal Investigative Task Force; [and]

(7) How the facilities transitioned from CIA "operational control" to DOD "operational control."

Id.

The CIA replied in September 2020.  Blaine Decl. Ex. 6.  Treating Connell's clarifications as an amended request covering the period September 1, 2006 to January 31, 2007 and encompassing the seven listed topics, the agency indicated that a "thorough search" had revealed one three-page document, which it released.  Id. at 1; Decl. of James G. Connell III ("Connell Decl.") Ex. A.  As to other records, the agency issued a *Glomar* response, stating that it could "neither confirm nor deny the existence of records responsive to your request."  Blaine

Decl. Ex. 6 at 1–2.  The agency explained that "[t]he fact of the existence or nonexistence of such records is itself currently and properly classified and is intelligence sources and methods information protected from disclosure by Section 6 of the CIA Act of 1949, as amended, and Section 102A(i)(l) of the National Security Act of 1947, as amended.  Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3)." Id.

Connell filed an administrative appeal in December 2020 and followed with this lawsuit in March 2021.  Blaine Decl. Ex. 7; see also Compl.  The CIA responded to the appeal in July 2021, indicating that it had found three additional responsive documents, two of which it released in redacted form and the third of which it withheld in its entirety.  Blaine Decl. Ex. 8 at 1.  The two additional documents released by the agency were:  (1) a Department of Defense ("DoD")-CIA Memorandum of Agreement ("MOA") concerning DoD's detention of certain suspected terrorists at Guantanamo; and (2) a proposed itinerary and memo for the then-CIA Director's visit to Guantanamo in December 2006.  Connell Decl. ¶ 11; id. Exs. B, C.  The agency withheld Document C06833121, which it describes as "consist[ing] of classified draft remarks/discussion points addressing a specific aspect of a sensitive Agency intelligence program/operation."  Blaine Decl. ¶ 41.  The agency also repeated its *Glomar* response.  Id. Ex. 8 at 2.

The CIA moved for summary judgment; Connell did not cross move.  See Mot. Summ. J. ("Mot.").  Connell has since indicated that he does not challenge the withholding or redaction of the documents the CIA deemed responsive.  Opp'n Mot. Summ. J. ("Opp'n") at 6 n.4; Pl.'s Status Report (July 29, 2021).  The lone remaining dispute, then, is Connell's objection to the agency's *Glomar* response.

## II.   Legal Standards

"FOIA cases typically and appropriately are decided on motions for summary judgment."

Eddington v. U.S. Dep't of Just., 581 F. Supp. 3d 218, 225 (D.D.C. 2022).  Under FOIA, federal

agencies are generally required to "disclose their records upon request," subject to several

exemptions.  Knight First Amend. Inst. at Columbia Univ. v. CIA, 11 F.4th 810, 813 (D.C. Cir.

2021) (citing 5 U.S.C. § 552(a)(3)(A)).  Agencies "may refuse to confirm or deny the existence

of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA

exception."  Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (cleaned up).  This practice,

known as a *Glomar* response, is proper if "the fact of the existence or nonexistence of agency

records" itself falls within a FOIA exemption.  Id. (cleaned up).  In considering a *Glomar*

response, courts apply the "general exemption review standards established in non-*Glomar*

cases."  Knight First Amend. Inst., 11 F.4th at 813 (cleaned up).  The burden falls on the agency

to justify the "applicability of FOIA exemptions."  Mobley v. CIA, 806 F.3d 568, 580 (D.C. Cir.

2015).

An otherwise valid *Glomar* response can be waived if the agency has "officially and

publicly acknowledged the records' existence."  Leopold v. CIA, 987 F.3d 163, 167 (D.C. Cir.

2021) (citing Am. C.L. Union v. CIA, 710 F.3d 422, 426–27 (D.C. Cir. 2013)).  An official

acknowledgement must satisfy a three-part test—the information requested (1) "must be as

specific as the information previously released;" (2) "must match the information previously

disclosed;" and (3) "must already have been made public through an official and documented

disclosure."  Wolf, 473 F.3d at 378 (quoting Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir.

1990)).  Plaintiffs relying on this strict test "bear the initial burden of pointing to specific

information in the public domain that appears to duplicate that being withheld."  Schaerr v. U.S.

Dep't of Just., 435 F. Supp. 3d 99, 116 (D.D.C. 2020) (quoting Afshar v. Dep't of State, 702

F.2d 1125, 1130 (D.C. Cir. 1983)).  When applied to *Glomar* responses, the first two prongs of

the inquiry merge—"if the prior disclosure establishes the existence (or not) of records

responsive to the FOIA request, the prior disclosure necessarily matches both the information at

issue—the existence of records—and the specific request for that information."  Wolf, 473 F.3d

at 379 (cleaned up).  The prior disclosure must thus "confirm the existence or nonexistence of

records responsive to the FOIA request."  Knight First Amend. Inst., 11 F.4th at 813 (citing Am.

C.L. Union, 710 F.3d at 427).  Courts should "accord substantial deference to an agency's

*Glomar* response and avoid searching judicial review when the information requested implicates

national security, a uniquely executive purview."  Eddington, 581 F. Supp. 3d at 225 (cleaned

up).

### III.   Analysis

The CIA supports its *Glomar* response with a declaration from Information Review

Officer Vanna Blaine.  See Blaine Decl. ¶ 1.  Like the agency's initial response to Connell's

FOIA request, Ms. Blaine grounds the *Glomar* response in FOIA Exemptions 1 and 3.  Id. ¶¶ 16,

22, 26.

Beginning with Exemption 1, Blaine correctly notes that it protects from disclosure any

information that has been properly classified pursuant to Executive Order ("E.O.") 13526, which

established the current system for classifying national security information.  Blaine Decl. ¶ 27.

Blaine further explains that she holds "original classification authority" under E.O. 13526,

meaning she has authority to assess the proper classification of CIA information up to the TOP

SECRET level.  Id. ¶ 3.  Exercising that authority, Blaine declares that she "ha[s] determined that

the existence or nonexistence of the requested records is a properly classified fact; the records

concern 'intelligence activities' and 'intelligence sources and methods' within the meaning of . . . the Executive Order; the records are owned by and under the control of the U.S. Government; and . . . the disclosure of the existence or nonexistence of [the] requested records reasonably could be expected to result in damage to national security." Id. ¶ 30.  Blaine continues, stating that formally acknowledging the existence or nonexistence of records "reflecting a classified or otherwise publicly unacknowledged connection between the CIA and the topics in Plaintiff's Amended FOIA request would reveal classified intelligence information and jeopardize the clandestine nature of the Agency's intelligence activities." Id. ¶ 34.  Either a confirmation or a denial, Blaine posits, "could be used by terrorist organizations, foreign intelligence services, and other hostile adversaries to undermine CIA intelligence activities and attack the United States and its interests." Id.

Blaine alternatively based the *Glomar* response on FOIA Exemption 3, which shields information that is specifically exempted from disclosure by statute.  Blaine Decl. ¶ 37.  One such statute is the National Security Act, which directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." Id. ¶ 38; 50 U.S.C. § 3024(i)(1).  The CIA relies on the National Security Act to protect its own sources and methods.  Blaine Decl. ¶ 38.  Consistent with her discussion of Exemption 1, Blaine asserts that "acknowledging the existence or nonexistence of records reflecting a classified or otherwise unacknowledged connection to the CIA in this matter would reveal information that concerns intelligence sources and methods, which the National Security Act is designed to protect." Id. ¶ 39.  While the National Security Act does not require the CIA to identify the damage to national security that might result should it confirm or deny the existence of a responsive record, Blaine points to the same potential harms noted with respect to Exemption 1.  Id. ¶ 40.

Courts "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." Am. C.L. Union, 710 F.3d at 427 (cleaned up).  An agency's rationale for invoking an exemption—even for *Glomar* responses—"is sufficient if it appears 'logical' or 'plausible.'" Id. (quoting Wolf, 473 F.3d at 374–75).

Connell does not dispute Blaine's authority to assess classification of CIA information. Nor does he contest that E.O. 13526 and the National Security Act are recognized grounds upon which to assert FOIA Exemptions 1 and 3, respectively.  Rather, he argues that the CIA has waived its ability to invoke Exemptions 1 and 3 to support its *Glomar* response because the agency has declassified "the intelligence connection between [the] CIA and Guantanamo Bay's Camp VII and [officially acknowledged] the existence of responsive documents about that connection."[2]  Opp'n at 5–7.  Specifically, Connell claims that "the [DNI] declassified CIA 'operational control' over Camp VII in 2014" and, since then, "CIA and other authorities have—until now—consistently treated both the fact of [the] CIA'[s] connection to Camp VII and the existence of documents providing specifics as unclassified, even if the specifics themselves are classified."  Id. at 8.  As a result, he argues, further "confirming or denying the existence of

---

[2]  While Connell presents declassification as a standalone basis for a *Glomar* response waiver—separate from the public acknowledgement test—he cites no authority supporting that approach and the Court has not independently found any.  While an agency can publicly acknowledge the existence of records by declassifying documents discussing that information, waiver still requires satisfying the three criteria of the public acknowledgment test.  To the extent that Connell relies on declassification to contend that the CIA's rationale for invoking exemptions 1 and 3 is not "logical" or "plausible," the Court rejects this argument.  The Court finds the CIA's description of the "potential harm from further disclosures is both logical and plausible," Competitive Enter. Inst. v. Nat'l Sec. Agency, 78 F. Supp. 3d 45, 60 (D.D.C. 2015), and that the declassified documents referenced do not definitively disclose the CIA's "operational control" over Camp 7.  "[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations."  Fitzgibbon, 911 F.2d at 766 (cleaned up).

responsive records will not result in a harm cognizable under Exemption 1 or 3 because the DNI has already declassified the intelligence connection [the] CIA claims to be protecting."  Id.

Before tackling Connell's waiver argument and the declassified materials upon which it is based, the Court will first pinpoint the topic of Connell's FOIA request that he claims the agency has publicly acknowledged.  As discussed above, Connell initially sought "any and all information" related to the CIA's purported "operational control . . . over Guantanamo Bay detainees."  Blaine Decl. Ex. 1 at 1.  He later clarified that he was interested in materials reflecting "what 'operational control' means," with reference to seven specific topics as examples.  Id. Ex. 4 at 1.  He further refined the request to cover the five-month period from September 1, 2006 through January 31, 2007.  Id.  And he reiterated that he was requesting the document cited at footnote 977 of the redacted SSCI Executive Summary, namely the "CIA Background Memo" for the CIA Director's visit to Guantanamo in December 2006.  Id.  With those refinements, the topic of Connell's FOIA request can fairly be described as records reflecting not only the fact of the CIA's purported "operational control" over Guantanamo detainees from September 2006 through January 2007, but also "what [that] operational control means"—that is, details about the CIA's purported operational control, including the seven questions Connell posed in response to the agency's call for clarification of his original request. See id.  The topic of Connell's request also includes the specific unclassified documents noted in the request:  the SSCI Executive Summary and the CIA Background Memo cited at footnote 977. Id.

Turning to Connell's *Glomar*-waiver argument, to support his contention that the CIA's "intelligence connection" to the topics of his FOIA request has been declassified or otherwise

9

officially acknowledged, Connell points to information contained in several publicly released documents.

He focuses primarily on the passage from the redacted SSCI Executive Summary quoted in his FOIA request, which states: "After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA." Opp'n at 12 (citing Zittritsch Decl. Ex. B at 160). The parties spar over whether the DNI's declassification of the quoted sentence in the executive summary is attributable to the CIA for purposes of the public acknowledgement doctrine. Opp'n at 11; Reply at 18–19. But the Court need not decide that question. Instead, assuming *arguendo* that DNI declassification suffices, the Court asks whether the passage matches the topics of Connell's FOIA request. In other words, does it acknowledge that the CIA in fact exercised "operational control" over Camp 7 and "what operational control means" in context? The Court thinks not.

As noted above, the information requested "must be as specific as the information previously released" and "must match the information previously disclosed." Wolf, 473 F.3d at 378 (cleaned up). The quoted sentence from the redacted SSCI Executive Summary does not meet this standard. For starters, it is not an acknowledgement *by the CIA* of its operational control over Camp 7; rather, it reflects the SSCI's characterization of the CIA's relationship to Camp 7, presumably based on its interpretation of the source document cited at footnote 977: the "CIA Background Memo" for the agency director's visit to Guantanamo Bay in September 2006. Accordingly, any CIA acknowledgment flowing from the declassification of the Executive Summary would only extend to the fact that the SSCI read the Background Memo cited at footnote 977 to imply CIA "operational control" over the fourteen detainees. That is not

10

enough to establish public acknowledgement.  Knight First Amend. Inst., 11 F.4th at 816

("While information from outside an agency may be viewed as 'possibly erroneous,'

confirmation by the agency itself 'would remove any lingering doubts.'" (quoting Frugone v.

CIA, 169 F.3d 772, 774–75 (D.C. Cir. 1999))).

The declassified sections of the CIA Background Memo do not acknowledge the CIA's

operational control over Camp 7, either.  See Connell Decl. Ex. C.  To the contrary.  The

redacted memo states that the CIA "sent fourteen high-value detainees to the high-value

detention center at GTMO."  Id. at 4.  It then indicates that "[u]pon their arrival . . . all detainees

are subject to the same general in-processing utilized by DoD for other detainees arriving at

GTMO."  Id.  That processing included "a medical exam by the on-site DoD physician, as well

as any needed dental and psychiatric care."  Id.  The memo continues that "[i]n order for a

detainee to be considered for transfer from the CIA program to GTMO, . . . the detainee must no

longer be of significant intelligence value" and be subject to trial by a military commission.  Id.

Finally, under a section heading titled "End Game[,]" the memo explains that the "CIA desires to

maintain custody of any given detainee only so long as that detainee continues to provide

significant intelligence."  Id.  Thus, if the unclassified portions of the memo suggest anything

about "operational control," it is that CIA transferred the fourteen high-value detainees to

Guantanamo, and relinquished "custody" over them, because they no longer had "significant

intelligence value."  Id.  And once the detainees were there, they were subject to customary DoD

procedures.  As a result, neither the quoted language from page 160 of the redacted SSCI

Executive Summary nor the CIA memo upon which it was based supports Connell's waiver

argument.

Connell also points to the following snippet from page 80 of the redacted SSCI's unclassified Executive Summary:  "On September 5, 2006, [detainee] bin al Shibh was transferred to U.S. military custody at Guantanamo Bay, Cuba.  After his arrival, bin al Shibh was placed on anti-psychotic medications."  Opp'n at 13 (citing Zittritsch Decl. Ex. B at 80). Connell contends that the DNI declassified references to two CIA documents supporting these statements.  Opp'n at 13.  But the passage says nothing about CIA "operational control."  Indeed, the CIA Background Memo indicates that psychiatric screening was a standard part of *DoD* intake procedures for all detainees who arrived at Guantanamo.

Next, Connell points to a redacted version of a 2006 MOA between the DoD and the CIA concerning "DoD's detention of certain individuals" at Guantanamo Bay.  Connell Decl. Ex. D at 1.  As far as the Court can tell, however, none of the unredacted material discusses the CIA's role or activities under the MOA, let alone acknowledges the agency's operational control of Camp 7.

Connell also relies on two facsimiles from the Office of the Director of National Intelligence to a lawyer at the State Department regarding the agenda for an upcoming "[i]nter-agency meeting."  Connell Decl. Exs. E, F.  An attached agenda—for a discussion of "Interagency Decisions Needed Regarding the 14 High Value Detainees"—includes questions on "[w]hat level of security clearance is required to adequately protect the classified information" about "the CIA program and physical access to the detainees" and "[w]ho should be permitted to have access to the detainees."  Id. Ex. E at 1–3.  These questions may well encompass some of the specific topics of Connell's FOIA request.  But a document that merely reflects the CIA's participation in an interagency meeting on those subjects falls far short of an acknowledgement

12

by the agency that it had "operational control" of Camp 7 or that documents concerning such "operational control" exist.

Finally, Connell cites excerpts from transcripts of military commission proceedings where defense lawyers, prosecutors, and the First Camp 7 Commander—all of whom are either employed or retained by DoD—referenced the CIA's purported operational control of Camp 7, including the sentence about "operational control" from page 160 of the SSCI Executive Summary.  See Opp'n at 15–18; Reply at 13; see also Connell Decl. Ex. G at 28584–86; Organization Office, Office of Military Commissions, https://www.mc.mil/ABOUTUS/OrganizationOverview.aspx.  Although not entirely clear to the Court, these proceedings appear to concern discovery disputes involving efforts by defense counsel to unearth specifics about the CIA's role at Camp 7.  See Decl. of Alka Pradhan ¶¶ 9–14. Connell claims that the CIA has declassified the transcripts. Opp'n at 16–18.  But like the executive summary, the transcripts only reflect characterizations of the CIA's relationship to Camp 7 by people outside the agency.  They say nothing about the CIA's position on the matter.

In sum, none of the unclassified information Connell highlights constitutes public acknowledgement by the CIA of its "operational control" of Camp 7 or the ins and outs of "what [such] operational control means."  See Wolf, 473 F.3d at 378 ("An agency's official acknowledgment of information by prior disclosure . . . cannot be based on mere public speculation, no matter how widespread." (cleaned up)).  As a result, none of the materials referenced constitute a public acknowledgement by the CIA of the existence of documents concerning the agency's purported operational control of Camp 7.

The agency therefore has not waived its ability to assert a *Glomar* response to Connell's amended FOIA request.  And because the Blaine Declaration "logically" and "plausibly" supports the response under FOIA Exemptions 1 and 3, the Court will uphold it.

A final point.  Even if the Court were to assume *arguendo* that the CIA acknowledged its operational control of Camp 7 by declassifying one or more of the documents Connell cites, the agency's *Glomar* response would still be valid.   In Wolf v. CIA, the CIA asserted a *Glomar* response with respect to a FOIA request for records related to former Colombian politician Jorge Eliecer Gaitan.  473 F.3d at 372.  The requester countered with evidence that a former CIA Director had given Congressional testimony decades earlier that included direct quotations from CIA dispatches referencing Gaitan.  Id. at 378–79.  The D.C. Circuit found that the testimony amounted to public acknowledgment of the existence of records about Gaitan.  Id.  It thus held that the agency's *Glomar* response "[did] not suffice regarding the dispatch excerpts that reference Gaitan."  Id. at 379.  The Circuit went on to find, however, that the "official acknowledgment waiver relate[d] only to the existence or nonexistence of the records about Gaitan disclosed by [the former Director's] testimony."  Id.  As a result, the requestor "[wa]s entitled to disclosure of *that* information, namely the existence of CIA records about Gaitan that ha[d] been previously disclosed (*but not any others*)."  Id. (emphasis added).  Applying Wolf here, if the release of the redacted SSCI Executive Summary or any of the other documents that Connell highlights triggered a public acknowledgement waiver, then he would be entitled to an acknowledgement of the existence of those specific documents "but not any others."  Id.  All of those documents have been produced to Connell or are otherwise publicly available.

14

Accordingly, the CIA's *Glomar* response was valid and the agency is entitled to summary judgment.  A separate order will follow.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 29, 2023</u>